In the Matter of the Petition of WILLIAM P. DUNN for the Probate of the Last Will and Testament of JOHN J. HICKS, Late of Albany, N. Y., Deceased.

WILLIAM P. DUNN, Proponent, Appellant; HARRIET B. HICKS, Residuary Legatee, Appellant; LIBBIE MAUDE RAUSCHER and Others, Respondents.

Third Department, September 11, 1918.

Will — probate — contest — presumption arising from due execution of will — evidence — admissibility of prior will — evidence insufficient to establish incompetency, fraud or undue influence.

In considering the evidence where the probate of a will is contested upon the ground of fraud and undue influence, and that the testator was not of sound mind, it is important to view the proposed will in connection with the presumptions arising out of the due and orderly execution of the same, and if it is found that the instrument itself is one which is under all the circumstances consistent with the environment in which the testator found himself, trifling incidents spreading over a considerable time will not be permitted to defeat his declared purpose.

A prior will made at a time when it is conceded that the testator was in full possession of his faculties has a bearing upon the question of the attitude of the testator toward his family, and is admissible in evidence.

Where a will made by a concededly competent person is identical in its scheme with that of a subsequent will, varying merely in detail, the details of which are not unreasonable or frequent, the natural inference is that the later will is merely the result of maturer deliberation.

Where a will has been duly executed in compliance with all the forms of law, it should be given probate unless the evidence clearly establishes that it was not in truth the expression of the will of a competent testator.

Evidence examined, and *held*, insufficient to establish that the testator was not of sound mind and memory and was afflicted with aphasia, or that the will was obtained by fraud, duress or undue influence.

A faithful wife has the right fairly to present her claims to the larger part of her husband's estate and the fact that she does so does not render the instrument void on the ground of undue influence.

APPEAL by William P. Dunn, proponent, and another, from a decree of the Surrogate's Court of the county of Albany, entered in the office of said Surrogate's Court on the 17th day of December, 1917, denying probate to the alleged last will and testament of John J. Hicks, and also from an order entered in said court on the same day denying appellants' motion for a new trial on the questions of fact submitted to the jury.

*Andrew J. Nellis*, for the proponent, appellant.

*Muhlfelder & Illch*, for the contestants, respondents (other than Mrs. Bowler).

*Borst & Smith*, for the contestant, respondent, Mrs. Bowler.

*P. C. Dugan*, of counsel, for the respondents.

WOODWARD, J.:

John J. Hicks, the testator, was seventy-five years of age, and, at the time of his death, was living with his second wife, a woman about fifty-two years of age, who appears to have been entirely devoted to him, and to have performed all of her wifely duties in a manner satisfactory to all parties, with the possible exception of some of the testator's married daughters of about her own age. The testator was married to his now widow in 1903, some fourteen years prior to his death. He had six daughters, five of them married and having homes of their own, while the sixth was a cripple, who lived with her married sister, a Mrs. Mitchell. Mr. Hicks was a furniture dealer, and in the course of a long business career had accumulated four pieces of real estate in the city of Albany, known as 85 and 87 Beaver street and 123 Beaver street, and two places on Hamilton street. He had a personal estate of some

$35,000 more or less, and it will be readily seen that the situation was one likely to result in will contests and other litigations.

The alleged last will and testament, which has been denied probate, has been found to have been executed with all the formalities required by law; it is, upon its face, an entirely valid instrument. It has been denied probate because the jury, answering specific questions, has found (1) that the said John J. Hicks, deceased, at the time of making said alleged will, was not of sound disposing mind and memory and capable of making a will; (2) that the said will was obtained by fraud, duress or undue influence, and (3) that the said will was executed with all of the forms of law, this latter being directed by the court.

The proponent appeals from the decree denying probate to this will, urging that the determinations made by the jury are not supported by the evidence, and that the verdict is against the weight of the evidence, and we are free to say that if this decree finds support in this record it is of but little use to have the statutory privilege of making a last will and testament. In considering the evidence in a case of this character it is important to view the proposed will, in connection with the presumptions arising out of the due and orderly execution of the same, and if we find that the instrument itself is one which is, under all the circumstances, one consistent with the environment in which the testator found himself, trifling incidents, spreading over a considerable time, will not be permitted to defeat the declared purpose of a testator.

This will provides for the payment of debts and then gives to his wife " all the household furniture, personal belongings and ornaments, jewelry, piano, pictures, musical instruments, china and cut glassware and all other personal property at and in our home No. 87 Beaver street, Albany, N. Y." He then gives to his wife and her heirs forever " all that tract or parcel of land with the buildings thereon, situate in the city of Albany, N. Y., and known as Nos. 85 and 87 Beaver street; also all that tract or parcel of land situate in said city, together with the buildings thereon, known as No. 123 Beaver street;" and the evidence in the case shows that this latter property

was used as the stable in connection with the business property at 85 and 87 Beaver street, the store and residence of the testator. Having thus provided for his wife, he gives to Libbie Maude Rauscher, his daughter, and her heirs forever, the property at No. 361 Hamilton street, and to his daughter Eva Mitchell (with whom the cripple daughter, Grace, resided) the premises known as 360 Hamilton street. This is followed with a provision giving " all the rest, residue and remainder of my property, both real and personal," one-half to his widow, and the remaining one-half to be divided into seven portions, one of which is given to each of the five married daughters, and two portions are given to the daughter Grace.

The most obvious thing about the scheme of this will is that it shows an intelligent discrimination between the persons fairly entitled to consideration by this husband and father. The daughter Eva Mitchell, who has the care of the crippled sister, is given a valuable house and lot, and one full portion of the residuary estate, concededly of considerable proportions. No real estate is given to Grace, but in lieu of this she is given two portions of the personal or residuary estate, and, as she was then about forty-two years of age, permanently crippled, it will be seen that she was fairly well provided for. What the circumstances were which prompted a like gift of a home to Mrs. Rauscher, to the exclusion of the remaining daughters, does not appear from the record, but such a gift is entirely inconsistent with the theory of fraud on the part of the widow, or those acting in her behalf, for if she or they were in control of the testator it was a mere waste of opportunity to make such a disposition of the Hamilton street premises. The provision for Mrs. Mitchell and that for Grace might be accounted for on the theory of expediency, perhaps, but what occasion was there for making a gift of real estate to Mrs. Rauscher; and, for that matter, of distributing any part of the personal property to any of the other sisters? Power is not apt to limit itself in such a manner; people who set out to rob an estate do not dissipate the funds among those whom they are about to despoil, where they are free to take all. A previous will, made at a time when it is conceded the testator was a shrewd business man in the full possession of his faculties, but which was excluded from the evidence

upon some theory not disclosed to us, had given Grace a legacy of $5,000, to become a charge upon all the real estate; had given each of four other daughters $250 each, and the fifth daughter $50, while all the remainder of his estate was given to his wife, and she was made the sole executrix. This will clearly had a bearing upon the question of the attitude of the testator toward his family; it was more favorable to his widow than the one which was offered for probate, and the comparatively small legacies for his daughters, other than Grace, indicates clearly that he did not, in 1910, regard them as standing in need of his bounty. They were all married, and presumptively in a position to care for themselves, with the exception of Grace, and for her he provided $5,000; while in the will now under consideration he has provided two-sevenths of his residuary estate, which appears to be worth at least $30,000 for this same crippled daughter, besides giving a home to the sister with whom she resided and a one-seventh. of the residuary estate.

The same dominant thought appears in both wills; the crippled daughter and the wife are of primary consequence, the others incidental; and before a jury was permitted to pass upon the questions of undue influence and incompetency it should have had the benefit of a reading of this will of 1910. Where a will, made by a concededly competent person, is identical in its scheme with that of a subsequent will, varying merely in detail, and the details of which are not unreasonable or freaky, the natural inference would be that the later will was merely the result of maturer deliberation, not that it was the result of irrationality on the part of the testator, or fraud on the part of those who chanced to be benefited by the changes. If the whole scheme of the will was changed; if Grace, rather than Bertha, had been cut off with fifty dollars, there would be the groundwork for an argument against the rationality and the integrity of the later will within its own limitations; but here we find Bertha, who before had been limited to fifty dollars, while her other married sisters were given two hundred and fifty dollars, put on a par with all of them, except Grace, in the matter of the residuary estate, and the fair inference is that the last will is the final expression of intention, unless it is shown by a fair prepon-

derance of evidence that this will, regularly executed and rational in all its provisions, was in fact the work of a mind or minds other than that of the testator.

There is nothing in the evidence to indicate that the will which was offered was not in all respects such a will as the testator, taking into consideration his entire property and his relations with all of the parties to this controversy, might properly have made. It may be said that a court of equity having the entire facts before it, as they are presented in this record, and called upon to make a distribution of this estate, might properly decree exactly the distribution which the will has attempted to make, except, perhaps, that it might require more evidence as to the reasons which surrounded the gift to Libbie Maude Rauscher, and, so far as we recall, she was the mother of more children than appear from the record to have fallen to the lot of any of the other sisters, and she appears to have been rather more active in her attentions to her father, without adding appreciably to his comfort. It was she who told Mrs. Hicks in her own home, in the presence of her husband, that the object in marrying her was to have a companion for Grace, a statement which Mr. Hicks denied, and who declared her intention of never coming into the home again, though she continued to visit Mr. Hicks in his store, beneath the home, at intervals, and — well, she appears to have fared somewhat better than some of her other sisters.

With such a will, duly executed with all the forms of law, which involves, of course, the declaration of the testator himself that it is his last will and testament, and a request that the witnesses sign the same, etc., it should be given probate, unless the evidence clearly establishes that it was not, in truth, the expression of the will of a competent testator. Here the evidence relied upon is of the most trivial character; isolated instances of inadvertence, carelessness or error, characterized by hostile witnesses to meet the demands of the case, and distorted in argument to take the place of legitimate testimony, which is almost wholly lacking. In this case three witnesses, wholly unimpeached; witnesses chosen by the testator, as affirmatively appears, testify to the formalities attending the making and publishing of this will. They all express the opinion that the testator was of sound disposing mind. One of these

witnesses, a woman lawyer who drew the will, testifies to the steps leading up to the making of this will; of her interviews with the testator, at his suggestion, and the manner of bringing the completed will to his attention. There were some difficulties in the matter of changing a former will; there was a question of whether the change should be made by a codicil or by a redrawing of the will, and this attorney formulated both and submitted them to the testator, and after reading them he selected the redrawn will as making his intention more clear, and after making such selection he asked to have a clerk in his store called as a witness, and subsequently, at the suggestion of his attorney (who was likewise a witness) he called in a third witness. No suggestion is made that this clerk was not an honest and upright man; nothing appears from which the inference can be drawn that this witness, or any of the others, had any other motive than the honest discharge of the obligations involved in being witnesses of the execution of the will, except that there is a subtle suggestion that the attorney was a friend of Mrs. Hicks, and that in some wholly undisclosed manner she induced the making of the present will. As this suggestion is of the same general character as that of most of the evidence offered by the contestants, and indicates to what lengths they have gone in an effort to defeat the will of their benefactor, it may be proper to look into it.

Counsel for the respondents quotes Dr. Houghton, who appears to have been the testator's family physician until the latter became interested in Christian Science and discarded his physician, that Miss Cole (the person in question) was a friend of Mrs. Hicks; that she was a lawyer; that she was there to watch him when Mrs. Hicks was out; " she [meaning Miss Cole] was a great friend of his wife  *  *  *  that she did some business for him, and he would do anything she [Miss Cole] asked him to do."

If we turn to folios 1883, 1884 and 1885, we shall discover this very willing witness, Dr. Houghton, prying into the affairs of the testator, and his obvious bias against Miss Cole. In his zeal to discredit Miss Cole he forgets that the purpose is to show that the testator was incompetent, and tells us that he saw the testator often; that he did business with him

right along up to the time of his death.  He not only claims to have done business with this alleged incompetent right up to his death, but he undertakes to literally imitate this unfortunate testator, who had suffered a paralysis of his right side, and to make this alleged incompetent a competent witness against the integrity of Miss Cole, though it may be said to his credit that he does purport to give all the language, and which does not limit Miss Cole's friendship to the wife, and does not give the legitimate impression that she was there to watch him for the purpose of directing the disposition of his property.  The evidence in the case shows that the testator had an attack of paralysis of the right side, which seriously interfered with his speaking; that he could be understood only by those who watched him carefully and intelligently sought to know his needs; that because of his affliction he had no use of his right hand; that he drooled from the corners of his mouth, and that he needed attention.  Without attempting to follow the literal quotation, Dr. Houghton testified that he inquired as to who Miss Cole was, and that Mr. Hicks replied that she was a friend of Mrs. Hicks; that she was his friend; that she watched him when Mrs. Hicks was out.  Is there anything in this to justify the insinuation so subtly made?  This mutual friend watched him while his wife went out?  Why not?  He needed someone to watch him; needed someone, as all the evidence shows, to minister to his comfort by wiping away the droolings from his face, and doing the services which one in that situation would require.  Taking the circumstances into account, how could any honest man suggest that there was in this declaration of Mr. Hicks any intimation that he was being watched for any other reason than his physical condition required that he should be watched.  It was his friend who was watching him; a mutual friend of himself and his wife, and the fact that Mr. Hicks declared that he would do anything that Miss Cole asked him to do, even in a business way, in answer to the impudent question of Dr. Houghton, merely indicates the loyalty of his friendship, and has no more legitimate bearing as evidence in this case than any other declaration, abstractly made, of confidence in those with whom he was associated.

This alleged declaration was made in the early part of

Third Department, September, 1918.            [Vol. 184.

October, 1916; the will was executed on the 24th day of November, 1916. It is obvious that Mr. Hicks at that time had no delusions as to Miss Cole; that he had no difficulty in making his language clear to Dr. Houghton. In short, the testimony of this physician, who had been displaced by Christian Science, clearly shows that early in October Mr. Hicks was not only transacting his own business, but he was able to make his language clear to Dr. Houghton, and to intelligently answer his questions as to the identity of Miss Cole; to correctly place her as his friend and the friend of his wife, and to express a confidence in her utterly at variance with the effort to show that the testator felt himself being watched in the sense in which the respondents would have us believe. If Mr. Hicks was irrational and incompetent at the time; if this was evidence upon which Dr. Houghton concluded him to be irrational, then it can have no legitimate tendency to establish that Miss Cole was engaged in any sinister watching of the testator. If, on the other hand, the evidence is intended to show that Mr. Hicks thought he was being watched it is not evidence of irrationality, and, as we have shown, is capable of an entirely innocent and proper discharge of the obligations of a mutual friendship.

And, in the light of this testimony of Dr. Houghton, what is to become of the deduction of Dr. McKenna, the expert for the contestants, who was present during the trial, and who obviously aided in the preparation of the hypothetical question upon which the case must largely hinge? This expert, who appears to have assumed to determine whether the testimony of witnesses was true or false, testified that from the peculiarities of the testator, as described by the witnesses, he concluded that Mr. Hicks suffered from paralysis with aphasia, and he defined aphasia as the inability of the person affected to make known to his associates, or persons with whom he comes in contact, the real nature of his thoughts, or desires, if he has thoughts or desires. On cross-examination he elaborates his definition of aphasia, and says that " a man might have a right side paralysis and his speech might be indistinct and mumbling and might not be understood by people, but he would know what he was saying and he would say what he wanted to say and the only difficulty would be

in understanding him; and he could write then if need be, or something. But with the trouble involving the brain which is called aphasia then it is no longer merely the centers of speech, but it is in that portion of the brain which receives the notion of what a man is looking at or trying to say, formulate it into the thought and sends it to the telegraph speech center, the tongue; if that is destroyed a man might see a watch and might know it was a watch but could not tell any living being it was a watch; he could not say what he wanted to say; he could not pick out type perhaps; he could not do anything in the world which would let the external people know just what was in his mind and just what he wanted to say. That is what is called aphasia, because the person who is suffering from aphasia is cut off from the world as far as letting anybody know just what he knows, just what he wants to do and just what he sees. There are some things he can do automatically; he could nod his head, shake his head; he could sign his name, he could obey instructions, perhaps; but the process of understanding what was in this center of the brain and to telegraph it to the speech muscles and of saying is lost because the wires are cut."

Certainly, if Dr. Houghton is to be believed, Mr. Hicks did not have aphasia, as thus defined, in the early part of October, subsequent to the paralysis and prior to the making of the will on the twenty-fourth day of November. Dr. Houghton asked who Miss Cole was and Mr. Hicks told him that she was a friend of Mrs. Hicks and a friend of himself; that she was a lawyer, and that she watched him when Mrs. Hicks was out. The contestants seek to use this on the one hand to show that Mrs. Hicks was making use of Miss Cole to further her interests; that Mrs. Hicks had Miss Cole to watch him in her absence for the purpose of seeing that he was not brought within the sphere of influence of his daughters, and then their expert closes his eyes to this testimony and, upon the incidents of a Christmas dinner not fully disclosed as to details, and a few trifling matters, reaches the conclusion that Mr. Hicks was afflicted with aphasia. Having reached this conclusion, he concludes that Mr. Hicks could not have told Miss Cole his desires in reference to the will, and by this process the deliberate act of Mr. Hicks is set at nought. Cer-

tainly the answer which Mr. Hicks made to the question of Dr. Houghton in reference to Miss Cole did not indicate aphasia; it was, barring the impediment in utterance, a clear and concise statement of facts in harmony with the known facts. Miss Cole was a lawyer; she was recognized as a friend of both Mrs. and Mr. Hicks, and she concededly did watch over him when Mrs. Hicks, his usual attendant, was out. Mr. Hicks found no difficulty in formulating the thought or in forwarding it to the tongue; the difficulty arose in the matter of articulation, and if we concede that Mr. Hicks used the words in the sense in which the contestants urge or suggest, that he was being watched in behalf of Mrs. Hicks, then this intelligent expression in words of his thought is destructive of the basis on which this decree .rests, for unless Mr. Hicks was afflicted with aphasia and could not communicate his will, there is not even the semblance of a foundation for withholding probate.

The verdict of the jury, that the will was induced by fraud and duress, must rest in a large measure upon this testimony of Dr. Houghton. Fraud and duress presuppose the existence of a person mentally capable of making a will, and the testimony of Dr. Houghton shows the existence of this mental capacity; but it likewise destroys the entire force of Dr. McKenna's testimony, based upon the theory of aphasia, and there is such a jumble of testimony, and the findings of the jury are so inconsistent with each other, that considerations of justice require that there should be a reversal of the decree.

One more of the many trivial circumstances and improper deductions from the testimony may be pointed out. We quote *verbatim* from the brief of contestants: " The *first* time Miss Cole says the testator talked with her about the will was shortly after election, 1916. The *second* time was between the 11th of November and the 22d or 23d. There were *three* times in November, 1916, that he spoke to her about the will. The *last* time was the 23d of November. Miss Cole was there at the Hicks home (according to her own testimony) *nine* or *ten* times during the first twenty-three days of November, 1916. She would be there *at night* two or three times a week. *On the night that she took notes for the will, she stayed all night with Mrs. Hicks.*"

There is exactly the same justification in the evidence for saying that she stayed all night with Mr. Hicks; she testified that she spent her week ends at about that time at the Schillings, at Troy; that she sometimes stayed at the Hoagabooms, in Albany, and that on the night of the twenty-third of November she stayed all night at the Hicks home. Both Mr. and Mrs. Hicks appear to have been at home that night, and she explains that the reason she stayed all night was that it was her custom, if it got beyond nine-thirty in the evening, to remain over night as she did not like to go home alone after that hour. That is all there is of this alleged staying all night with Mrs. Hicks. She was a friend of the family and of other families, and she felt at liberty to remain over night if she had lingered beyond a prudent hour of the night to be out alone. This witness was entirely frank; there was not the slightest indication of any disposition to quibble or to cover up anything; she told exactly what she did, so far as we can know, openly and fully, as any other member of the profession might have done, and the inferences sought to be drawn from the evidence, in support of the theory of fraud, are wholly without justification in any fair reading of the evidence.

And then stress is laid on the alleged fact that at one time, out at a camp, Mrs. Hicks fell on a stone pile and sustained injuries which caused her to cry out, and that Mr. Hicks, who was but a short distance away, made no effort to go to her, or paid any attention to the incident. Well, Mr. Hicks was paralyzed on his right side; he was unable to walk without assistance. There is no evidence that he heard the alleged outcry. If he did hear it and was an intelligent Christian Scientist he was entirely consistent in ignoring the seeming fact.

But returning to the alleged aphasia, even Dr. McKenna concedes that one afflicted with this difficulty may know what he wants to do; he is simply cut off from expression of the thought — he cannot formulate in words the idea he would express. But here the undisputed evidence is that Mr. Hicks did tell Miss Cole what he wanted in his will. He had, some six months before, made another will, and this he desired to have changed in certain respects and he told Miss Cole what

Third Department, September, 1918.          [Vol. 184.

these changes were to be; he spoke to her three times about it; told her where she would find the will to be changed, and after he had told her these things he told Mrs. Hicks, in the presence of Miss Cole, what he proposed doing. They were on friendly terms; what reason was there why this man of seventy-five, living harmoniously with his wife, should not inform her of the making of his will? Then Miss Cole drew a codicil for the prior will, and not being able to make it fit into the prior will in such a manner as to give it clear expression, she drew a new will, embracing the features of the prior will not inconsistent with the codicil, and these two instruments she submitted to Mr. Hicks, and he picked out the one that he desired to execute after reading both of them. No one pretends that Mr. Hicks, even with aphasia, could not read, or that he could not determine what he wanted after reading, and the undisputed evidence, by unimpeached witnesses, is that he did read the paper propounded as his will, and that he did conform to all the requirements of the statute in executing that will. To defeat this clearly expressed and lawfully executed will by the innuendo which runs through the entire case would be to disregard the fundamentals, and to make a virtue of mere sophistry.

It does not seem necessary to go over all of the evidence offered and to point out its defects; they are many and obvious. It is sufficient to say that the finding of the jury, under the instructions of the court, that the will was executed in accordance with the requirements of law, is sufficient to justify the probate of the instrument offered in the absence of evidence fairly intended to establish either that the testator was incompetent, or that the will of other minds controlled in the making of the same. No such evidence is to be found in this record. The uncontradicted evidence is that the testator actively participated in the conduct of his business down to the very day of his death, and there is nothing to show that any undue influence, or that any influence, was brought to bear upon him. A faithful wife would have the right to fairly present her claims to the larger part of the estate of her husband; it is only the exertion of undue influence which the law condemns, and there was nothing in the circumstances or the relations of the parties which gave rise to any just suspicion

that any such influence was exerted. The will upon its face is an intelligent and rational disposition of the property under the circumstances disclosed, and we are of the opinion that the learned surrogate erred in permitting the jury to pass upon the issues suggested.

The decree of the surrogate should be reversed and the matter remitted to the surrogate to enter a decree in harmony with this opinion, with costs to the appellant.

All concurred; COCHRANE, J., in result.

Decree of the Surrogate's Court reversed and matter remitted to said court to enter a decree in harmony with this opinion with costs to the appellant.