In the Matter of the Probate of the Last Will and Testament of FREDERICK WOLF, Deceased.

WILLIAM H. SCHICK and THOMAS H. WARD, Executors Named in the Last Will and Testament of FREDERICK WOLF, Deceased, and Others, Appellants; LYDIA K. BEACH and Others, Respondents.

Fourth Department, May 11, 1921.

**Wills — probate — testamentary capacity defined — verdict that testator was not of sound mind contrary to evidence.**

If at the time the testator made his will he knew enough to understand and appreciate the nature and extent of his property, and if he knew the relation he bore to those who would naturally be the objects of his bounty,

and if he knew and understood what he was doing when he made the will — that is, understood the nature of the transaction — he possessed testamentary capacity, even though he may not have been a man of the highest and strongest mentality.

The mere fact that the testator was aged and infirm raises no inference that he lacked testamentary capacity.

On all the evidence, *held*, that the testator was competent to make a will and that the verdict of the jury that the testator was not of sound mind was contrary to the evidence and should be set aside, and that the decree refusing probate should be reversed and the matter remitted to the surrogate to enter a decree admitting the will to probate.

APPEAL by William H. Schick and others from a decree of the Surrogate's Court of the county of Onondaga, entered in the office of said surrogate on the 18th day of March, 1920, denying probate of the will of Frederick Wolf, deceased, and also from an order entered in said surrogate's office on or about the same date, denying appellants' motion for a new trial made upon the minutes.

*Thomas H. Ward* [*Walter Welch* of counsel], for the appellants, executors and others.

*William H. Bamerick*, special guardian of Frederick Wolf and others, appellant.

*R. J. Shanahan*, for the respondents.

CLARK, J.:

On the 20th day of May, 1918, Frederick Wolf, long a resident of the city of Syracuse, N. Y., executed in due form an instrument in writing, sought to be proved as his last will and testament.

No question is raised as to the due execution of this instrument, and although in their objections filed, contestants urge that the will was the result of undue influence brought to bear on testator, that part of the contest was abandoned on the trial, and the only question submitted to the jury was as follows: " Was Frederick Wolf of sound mind on May 20, 1918? "

The issue was sent to a jury for trial and the jury answered the question propounded in the negative, whereupon the surrogate made and entered an order denying probate to the will in question.

Frederick Wolf, the testator, had lived in Syracuse many years, and had long been successful in business in that city. He had accumulated considerable property, but most of it had been disposed of among his children before he made his will, so that at the time of his death his estate did not exceed in value more than $15,000. His wife had predeceased him, and he died August 9, 1918.

This was not a death-bed will, for he lived nearly three months after it was executed, and during that interval he was up and around his house, and on the streets of the city the same as he had been for some time previously. He was about seventy-six years of age at the time the will was made, and had four adult children, all married. Two daughters and a son lived in Syracuse, and the fourth child, a son, lived in California.

By the terms of the will he bequeathed to a daughter, Lydia Beach, a black walnut pier glass and marble top table. He had previously conveyed to this daughter a valuable piece of real estate in Syracuse. He gave to his son Cyrus Wolf $1,000, but out of that it was provided in the will there was to be deducted whatever testator had been obliged to pay on two certain judgments against Cyrus. He stated in the will that the reason for this bequest to Cyrus limiting it to $1,000 and subject to the payment of these judgments was " the abuse I suffered from him [Cyrus] and his present wife."

He gave to his grandson Frederick Wolf $200, and to each of five children of his deceased brother William Wolf $100, and to his grandchildren Margaret and Fred Harold Schick the house in which he lived in Syracuse, and all the rest of his property he devised to his daughter, Mrs. Ida Schick.

The reasons assigned by testator for making the will in this way are clearly set forth in the testimony of Mr. Ward, the lawyer who drew the will, and who was one of the subscribing witnesses.

He testified that late in the afternoon on the day the will was made (May 20, 1918) Mr. Wolf came to his office alone. This lawyer was an old and reputable practitioner at the Onondaga county bar, and he had been testator's attorney for some years. Mr. Ward testified that testator told him at that time that Cyrus had been getting married, and he and his

wife were unkind to him, and would not give him his meals and medicine when he was sick, and he directed that his will state why he gave to his son Cyrus but $1,000, burdened with the payment of two judgments.

Mr. Ward further testified that testator told him that his daughter Mrs. Beach had had her share previously, including an item of $2,000, which he had paid on her account. He further testified that Mr. Wolf told him the reason he gave his home place to his grandchildren Florence and Fred Harold Schick was that they had been good to him and had run errands for him, and had brought him his meals, and that they had done things for him that his own children would not do.

He further testified that Mr. Wolf told him that one of the reasons he wanted the residue of his estate to go to his daughter Ida Schick was that she had lost an eye when a little girl, which he had always felt he was responsible for.

Mr. Ward testified that testator looked natural and bright, his eyes were clear, he answered questions put to him promptly and intelligently, and talked and acted naturally; that after the will was drawn he asked to have portions of it re-read, and suggested one or two changes, which were made before the will was executed, and that testator was of sound mind.

The other subscribing witness to the will was a young lady, the clerk in Mr. Ward's office. She testified that Mr. Wolf came to the office alone on the day the will was made. She had known him for upwards of three years, and saw him frequently at Mr. Ward's office. She testified that after the will was drawn testator asked her personally if she would be a witness to his will, which she consented to do. She testified that he signed it in her presence, declared it to be his last will and testament, and that she and Mr. Ward signed it as witnesses at his request, in his presence, and in the presence of each other.

She also testified that he looked bright, that he had no cane or glasses, that he came to the office and departed alone, and that he was of sound mind and competent to make a will.

The evidence of these subscribing witnesses was in no way discredited or impeached, and because of the fact that they were present and saw testator at the time the will was made, they had better opportunity to observe, and more reliable

sources of information in regard to his condition, and whether or not he possessed testamentary capacity than any other witnesses. (*Matter of Comstock*, 26 N. Y. St. Repr. 292.)

This will was executed with a careful observance of all the forms of law — it was *duly* executed, and should be probated, unless it was not the will of a competent testator. (*Matter of Dunn*, 184 App. Div. 386, 391.)

In addition to the subscribing witnesses who had the best opportunity to know the actual situation and capacity of Mr. Wolf at the time the will was made, proponents produced some eighteen witnesses who had known testator, some of them for many years, business men and neighbors, and pastors of his church, who testified to conversations had with Mr. Wolf in 1917 and 1918, prior to the making of the will. The evidence disclosed that some of these witnesses played checkers with him in April or May, 1918, just before the will was made, and on one occasion he played a game of checkers with an expert from out of town, winning two games out of three that were played. Deceased was an expert checker player, and in March or April, 1918, witnesses testified that they discussed checker problems with him.

Other witnesses testified that they talked with deceased about repairs to property he owned, which repairs he promised to make, and did make. Bankers with whom testator did business just prior to the making of the will, gave testimony as to his acts and conversations, and old neighbors testified that his acts and conversations as testified to by them, impressed them as being rational, and finally Dr. Hersey G. Locke, a member of the faculty of Syracuse University, a man of large experience, who has specialized in mental diseases, gave testimony in behalf of proponents, and basing his opinion on the elaborate hypothetical question of proponents, gave it as his opinion that testator was of sound mind on the day he made his will.

To meet this evidence in their endeavor to destroy the will, contestants produced some eleven witnesses, including two physicians, who testified to various conversations they had had with testator in 1917 and 1918, and they testified that such conversations impressed them as being irrational, and the two physicians basing their opinion on facts stated in a hypothetical

question propounded by contestants, gave it as their opinion that testator was of unsound mind.

The evidence of contestants does not appeal to me as being satisfactory. It does not ring true. In several instances the witnesses were plainly hostile, or were related in some way to some of the contestants.

Several witnesses who gave evidence in behalf of contestants testified that the acts and conversations of Mr. Wolf as described by them, impressed them as being irrational, and they were related to contestants as follows: Charlotte A. Gunn, sister-in-law of one of the contestants; Edwin Slawson, brother-in-law of one of the contestants; G. F. E. Meistring is a relative of some of the contestants; George D. Gunn is a brother-in-law of one of the contestants, and George I. Beach is husband of one of the contestants. He was a very biased witness.

This case had been previously tried, and he was a witness on the former trial, but his recollection had evidently been refreshed since then, for he testified to very many different transactions on this trial that were not referred to on the former trial. It gave rise to the suspicion that perhaps the necessities of the case stimulated his recollection.

The two physicians who testified in behalf of contestants, that Mr. Wolf was of unsound mind, were neither of them his attending physician. It is worthy of remark that on the former trial contestants produced Dr. Belch, Mr. Wolf's attending physician, and he was sworn and gave testimony, but they did not produce him on the last trial.

Much of the evidence relied on by contestants in an effort to set aside this will was trivial in its nature, and in several instances given by witnesses who were hostile.

The due execution of the will being clearly shown, and no question of fraud or undue influence entering into the case, the only remaining question was as to the testamentary capacity of Mr. Wolf at the time he made his will.

If at that time, not some other time, but at the time he made his will, he knew enough to understand and appreciate the nature and extent of his property, and if he knew the relation he bore to those who would naturally be the objects of his bounty, and if he knew and understood what he was doing

when he made the will — that is, understood the nature of the transaction — he possessed testamentary capacity, even though he may not have been a man of the highest and strongest mentality.

He was an aged man and somewhat feeble, but was up and around the house, going on the streets of the city frequently, transacting some business, such as collecting rents and giving receipts for them, and doing it all properly.

The mere fact that this testator was aged and infirm raises no inference that he lacked testamentary capacity. Our laws in their clemency and beneficence undertake to assist the aged and infirm in making testamentary disposition of their property, and do not seek to put obstacles in their way to prevent them from doing it.

The evidence is undisputed and given by perfectly reputable witnesses, that testator went alone to his lawyer's office on the day the will was made, and used no cane or glasses. That does not indicate extreme feebleness. He told the lawyer just how he wanted the will made, and gave his reasons therefor. These reasons, which were testified to by at least one of the subscribing witnesses, evidently did not appeal to the jury, for they undertook to do what juries often do, and that is, to make a new will for a testator, overlooking the fact that if he was of sound mind and was not improperly influenced, he and not they had a right to make the will, and do as he saw fit with his property.

In all the evidence produced by contestants tending to show that Mr. Wolf was irrational there was nothing in his acts or conversations, as detailed by the witnesses, that was unusual in a man of his age. He may have been peculiar and eccentric, and he may have looked pale and thin, and he undoubtedly walked slowly and perhaps dragged one foot, but these conditions would not render him incompetent to make a will. He had been in poor health for some time, suffering from chronic nephritis and valvular heart difficulty, but that condition in and of itself did not make him incompetent, for he transacted business right along, collected rents, gave checks and receipts, and shortly before the will was made he subscribed for a $1,000 Liberty bond, making and signing in person the check with which he paid for it.

The evidence of contestants fails to prove that Mr. Wolf was not capable of making a will on the day this instrument was executed. On the contrary, from the evidence of the subscribing witnesses, which was undisputed, it would appear that he was at that time rather above the average of intelligence considering his age and enfeebled physical condition.

Then why is it that a jury should set aside the will in the face of overwhelming evidence that testator was of sound mind? The answer is found in the general desire of juries in will cases to endeavor to even things up between a dead man's heirs and compel him to do with his property what they think ought to have been done without regard to his absolute right to do as he pleased with his property if he was of sound mind and acted of his own volition.

If Mr. Wolf was competent to make a will on May 20, 1918, it was his business, and not the business of outsiders, to say how much of his property he should give to any one or more of his children.

Unless we are going to do away with the right to make testamentary disposition of one's property, it is time to take the position that when a man shows the capacity to make a valid will, as was shown in this case, the right to do so should be upheld, and not be jeopardized by a sympathetic jury.

Mr. Wolf was clearly shown by overwhelming evidence to have had testamentary capacity on the day this will was made, and was competent to make a valid will. (*Delafield* v. *Parish,* 25 N. Y. 9; *Matter of Snelling,* 136 id. 515; *Matter of Dunn,* 184 App. Div. 386; *Matter of Heaton,* 224 N. Y. 22.)

Proponents complain of many of the rulings of the court, and it would seem that in some instances, under the guise of endeavoring to show testator's mental condition, contestants were permitted to get before the jury evidence which tended to show undue influence when that question was not in the case, but the verdict was not supported by sufficient evidence on the question of testamentary capacity, and it is not necessary to pass on those questions.

There is no pretense that any one was with testator when he went to his lawyer's office to have his will drawn, or that he could not read or write, or that he did not tell what he wanted done with his property, or that he did not state clearly his

reasons for making the provisions in his will as he did make them, or that he did not in person select the subscribing witnesses to the will and request them to sign it as such, or that he did not sign his name unaided, and in every way comply with all regulations of the Decedent Estate Law (§ 21) in the execution of the will.

There is no evidence that he even had a memorandum as to what he wanted done with his property, but was able to and did tell the lawyer just what disposition he wanted to make of his property without any reference to any writing that he had previously made. He knew what he wanted and was able to tell it without difficulty.

Now under these circumstances, to defeat the will of such a man on the unsatisfactory evidence produced by contestants is not doing justice by the living, and is certainly doing a great injustice to the dead. It amounts to taking away from a competent man the right given to him by statute to make testamentary disposition of his property. (See Decedent Estate Law, §§ 10, 15, 21.)

The will was concededly executed in accordance with the requirements of the law, it expressed the wishes of a competent testator, it is intelligent and rational on its face and should not have been denied probate.

The verdict should be set aside on the ground that the evidence is insufficient to show lack of testamentary capacity, under the rule as laid down in *Matter of Case* (214 N. Y. 199) and *Seeley* v. *Osborne* (220 id. 416, 422), the decree of the surrogate refusing probate should be reversed, and the matter remitted to the surrogate to enter a decree admitting the will to probate (Code Civ. Proc. § 2763; *Matter of Goodhart*, 173 App. Div. 256), with costs to appellants payable out of the estate.

All concur; KRUSE, P. J., not sitting.

Decree reversed, verdict of jury set aside upon the ground that the evidence is insufficient to show lack of testamentary capacity, and matter remitted to Surrogate's Court with directions to admit the will to probate, with costs to appellants payable out of the estate.