In the Matter of Proving the Last Will and Testament of MARIA T. DOTTERWEICH, Deceased.

ANDREW C. DOTTERWEICH and Another, Appellants; GEORGE J. DOTTERWEICH and Others, Respondents.

Fourth Department, July 1, 1924.

Wills — probate — testatrix was eighty years old when will was executed — testatrix died two years and four months after execution — verdict that will was not duly executed, that testatrix was of unsound mind and that undue influence was used is contrary to evidence.

The verdict of a jury in a contested will case that the will was not duly executed, that the testatrix was of unsound mind when she executed the will and that undue influence was used is not sustained by the evidence, since it appears that the testatrix was eighty years old when she executed the will and died two years and four months thereafter; that for a great many years she had conducted her own business, which was of large volume, and continued to do so until a very short time before her death; that the two subscribing witnesses, one of whom was a reputable attorney who drew the will, testified positively to the due execution of the will and gave testimony to show that the testatrix was of sound mind at the time the will was executed, and since the evidence in opposition to the probate is very meagre and unsubstantial while many witnesses corroborated the subscribing witnesses in their testimony as to the mental soundness of the testatrix.

The fact that the testatrix left a considerable part of her property to her two unmarried daughters who always lived with her and took care of her home, does not show that they exercised undue influence over her in making the will, for the mere fact that they had an opportunity to do so raises no inference that they did exercise undue influence, and there is no evidence in the record whatever from which undue influence can be inferred.

APPEAL by the proponents, Andrew C. Dotterweich and another, from a decree of the Surrogate's Court of the county of Chautauqua, entered in the office of said Surrogate's Court on the 12th day of March, 1923, refusing probate of the last will and testament of Maria T. Dotterweich, deceased, with notice of intention to bring up for review an order of the Chautauqua County Court entered in the office of the clerk of the county of Chautauqua on the 5th day of March, 1923, denying the proponents' motion for a new trial

made upon the minutes after the trial by jury of issues framed by said Surrogate's Court and referred to said County Court for trial before a jury.

*John L. Hurlbert* [*William S. Stearns* of counsel], for the appellants.

*Thomas P. Heffernan* [*J. S. Lambert* of counsel], special guardian and attorney for certain respondents.

*O. B. Augspurger* [*J. S. Lambert* of counsel], for the respondent George J. Dotterweich.

CLARK, J.:

On the 28th day of February, 1919, Mrs. Maria T. Dotterweich, who had been a resident of the city of Dunkirk, N. Y., for upwards of sixty years, executed an instrument in writing, which is sought to be proved as her last will and testament.

The executors named in said will inaugurated the usual proceeding for its probate, citations were issued, and on the return of the citation four grandchildren of testatrix interposed objections, denying that the instrument propounded as the last will and testament of testatrix had been duly executed, and alleged lack of testamentary capacity and undue influence.

The issues raised by the objections were sent to a jury for trial and the court submitted the following questions:

*First.* Was the paper writing dated February 28, 1919, and purporting to be the last will and testament of Maria T. Dotterweich, deceased, duly executed as and for her last will and testament pursuant to the Statute of Wills of the State of New York?

*Second.* Was Maria T. Dotterweich, the decedent, of sound mind and memory sufficient to make her last will and testament at the time of the execution of such paper dated February 28, 1919?

*Third.* Was said Maria T. Dotterweich, the decedent, acting free from undue influence practiced upon her by any one at the time of the execution of said paper writing dated February 28, 1919?

All three questions were answered in the negative, whereupon the surrogate made and entered a decree denying probate to the will in question.

For convenience the questions involved will be considered in the order in which they were submitted to the jury in the court below.

Was the instrument in question duly executed?

The Decedent Estate Law (§ 21) provides how wills should be executed.

The instrument must be subscribed by the testator at the end of the will, and in the presence of each of the attesting witnesses,

or shall be acknowledged by him to have been so made, to each of the attesting witnesses.

The testator, at the time of subscribing the will, or at the time of acknowledging it, must declare the instrument so subscribed to be his last will and testament, and there shall be at least two attesting witnesses, each of whom shall sign his name as a witness, at the end of the will, at the request of the testator.

The statute does not require any particular form of declaration in the execution of a will. It may even be by signs or by actions and conduct from which it may be inferred that the party is executing a paper which he understood to be his will. (*Matter of Hunt*, 110 N. Y. 278; *Matter of Menge*, 13 Misc. Rep. 553; *Matter of Dybalski*, 199 App. Div. 677.)

As we said in *Matter of Dybalski* (*supra*): "If testatrix understood what she was doing when she executed the will, and the witnesses understood that a will was being executed by her, it is sufficient."

The fact that testatrix spoke only broken English is of no special significance. If the witnesses understood what she was saying and doing at the time the will was executed, and she understood them and what they were doing when they signed the will as witnesses, there was a substantial compliance with the statute, and that is all that is required. (*Matter of Hunt, supra*.)

At the time this instrument was executed Mrs. Dotterweich was between eighty and eighty-one years of age. She lived two years and four months after the will was made. She had previously executed one will and two codicils, and they were all executed in the presence of the same witnesses who attested the will in question.

This will was prepared by John L. Hurlbert, a reputable lawyer of the city of Dunkirk, who had acted as the legal adviser of testatrix for many years, and who had prepared her previous will and codicils.

His testimony with regard to the execution of this will is not disputed, and it is briefly as follows: On the 28th day of February, 1919, he was called to the home of decedent by someone. On arriving there shortly after noon he saw her in her dining room, and she was alone and up and about the house. He had been at the house two or three days before and at that time she told him that she wanted to make some changes in her will which he had formerly drawn for her. Mr. Hurlbert and testatrix were at that time alone also in her dining room. He testified that she told him what changes she desired to make and he noted them down. Mr. Hurlbert returned to his office and prepared the will in question, and sent word to the testatrix, or to her home when he would come with the new will, and sent word to the other subscribing witness, Mr. Frey, to be at the home of deceased at

a given time on the day the will was executed.  Mr. Hurlbert reached the home of decedent first and, as he testified, he read the will to her paragraph by paragraph, and discussed it with her, and in places that he had left blank for the purpose of giving her time to reflect as to amounts that she wanted to give to certain grand-children, she told him the amounts to fill in, and he did so, and completed reading the will to testatrix before the other witness arrived.

When Mr. Frey arrived Mr. Hurlbert asked testatrix if she was ready to sign the will, and she said it was all right.  She had a pen and ink there and she signed her name at the end of the will in the presence of both witnesses.  No one else was present in the room except testatrix and the two subscribing witnesses.

Mr. Hurlbert also testified that he asked her if she acknowledged the execution of the paper that she had signed, and she replied that she did, and he continued: "I asked her if she declared it to be her last will and testament and she said she did, and I asked her if she wanted Mr. Frey and myself to sign it as witnesses, and she said she did, and I proceeded to sign it as a witness and Mr. Frey signed it immediately after me."

Testatrix then told her lawyer to keep the will, and when he returned to his office he took it with him.

Mr. Hurlbert further testified that at the time of the execution of the will Mrs. Dotterweich was not acting under any restraint or undue influence whatever, and that she was of sound mind.

Richard Frey, the other subscribing witness, who had known testatrix over forty years, and who had been a witness to her former will and codicils, testified that when he arrived at her home on the day of the execution of this will, testatrix and Mr. Hurlbert were in the dining room and alone.  The will was lying on the table.  He testified: "Mr. Hurlbert kind of laid it [the will] over and showed it to her, and he asked Mrs. Dotterweich if she wanted him and me to be witnesses on this will, and she said 'Yes.'  She then signed the will and we signed it, all at the same time."

He also testified that she was not laboring under any restraint at the time that he could observe, or any undue influence, and that she was of sound mind.  He also testified that at the time she said this was her last will and testament, and asked Mr. Hurlbert and himself to sign it as witnesses.

I have quoted the testimony of the subscribing witnesses at some length, for they were the only persons living at the time of the trial who were present when the will was executed, and who saw what testatrix did and heard what she said, and observed her condition of health and all the surrounding circumstances.

They were in better position than any one else to tell what actually occurred when the will was executed, and as to the condition of testatrix, both physically and mentally. She was dressed and up and around the house. No one assisted her in any way so far as the record discloses. She talked and acted for herself. The evidence of these disinterested witnesses is in no way disputed or contradicted. It is clear that this will was executed according to law. It was duly executed, and if the testatrix was competent and acted freely and of her own volition it should not be denied probate. (*Matter of Dunn*, 184 App. Div. 386.)

The finding of the jury in answer to the first question submitted to them, to the effect that the will was not duly executed, is contrary to and against the weight of the evidence, and is disapproved and reversed.

Was testatrix of sound mind?

Testatrix was born in Germany and came to this country when she was twenty-three years of age. She soon married, and she and her husband were prosperous, and reared a large family. Five children, three sons and two daughters, survived her, all being of full age, and there were several grandchildren, children of her two deceased sons.

Mrs. Dotterweich's husband predeceased her over twenty years, leaving her a considerable estate, which had been well managed by her, and exceeded $125,000 at the time of her death.

While born in Germany testatrix had lived sixty years in Dunkirk and was able to talk English to some extent, although brokenly. Four witnesses called by contestants testified in substance that in talking with her what they said in English had to be interpreted to her, and this was usually done by one of her daughters.

Something like fourteen or fifteen witnesses, called by proponents, testified in substance that they had known testatrix for years, and that while she spoke broken English, they understood her, and she understood them when talking in English. Her lawyer, Mr. Hurlbert, who drew her will, and had transacted her legal business for from fifteen to twenty years, always talked with her in English. He could not talk or understand German. Men who had insured her property and negotiated loans with her, her gardener who worked under her orders, and people who had borrowed money and paid interest to her, testified in substance that she not only understood but spoke English so that they had no difficulty in understanding each other in ordinary conversation carried on in English.

The evidence was largely preponderating to sustain the proposition that testatrix spoke and understood English, and that evi-

Fourth Department, July, 1924.    [Vol. 210

dence, with the fact that she had lived sixty years in a community where English was the language usually employed among the people, leaves no doubt whatever in my mind that this old lady was able to understand and speak English, so that she and those with whom she conversed in that language could understand each other.

Testatrix had always enjoyed good health up to a year before her death, when she had a slight shock, but that was of such a trivial character that she was confined to her bed only a very short time. She was up and around and in good health up to within about a week of her death, and within that time had paid a bill by check that she signed. She paid out moneys, hired and directed the operations of her gardener, and paid him, she negotiated loans, and received payments of principal and interest, in fact testatrix had always since her husband's death, and practically as long as she lived, transacted an unusual amount of important business for a woman of her years. She had two unmarried daughters past middle life who had always lived at home, and who did most of the housework. It was perfectly natural that one of them should assist her in making indorsements of payments on her securities, for she did not pretend to write English, but she kept charge of her business, kept her securities in a locked tin box in her room and carried the key herself, excepting when she would send one of her daughters to get a particular paper from the box.

It is clear that whatever the daughters did with reference to assisting their mother was done under her direction. I am satisfied that testatrix was an old-fashioned, thrifty German woman, and that she had a strong and active mind for a person of her years.

A witness, Elizabeth McCarthy, gave very interesting testimony touching the business capacity of Mrs. Dotterweich. At one time, a good many years before testatrix's death, Mrs. McCarthy testified that she applied to her for a loan on a farm she intended to buy. She testified that testatrix asked her if she thought it was a good farm, and finally said before she decided to make the loan, she would hitch up her horse and that she and the girls would drive down and look over the place. She did so, looking it over carefully, and on the return journey this witness testified that Mrs. Dotterweich said: " Well, I will advance the money for this land, and with what money you have got you can go on and put up the buildings with it, and then after you get done if you have anything left you can turn it on the land and buy the farm with."

She also testified that Mrs. Dotterweich said: " I haven't got the money now to-day, or just now, and will have to have thirty days time."

This conversation was in English, all of it. Business relations continued between this witness and testatrix from that time to her death. Mrs. McCarthy paid interest and principal to her, and she testified that these payments were always made to Mrs. Dotterweich. She had a business transaction with her as late as November 8, 1919, when decedent indorsed a note with this witness.

One country physician who had never seen testatrix, in answer to a hypothetical question propounded by contestants, testified that he " did not think " testatrix was of sound mind when she made her will.

A reading of his entire evidence leads to the conclusion that his opinion as to the old lady's soundness or unsoundness of mind was a mere guess, and that it has little probative force when compared with the testimony of her neighbors who had known her for years, who told of their conversations with the old lady, carried on in English, of their business transactions with her, and which evidence, if true, would show testatrix to be a person of more than ordinary intelligence and strength of mind and character for a person of her years.

It must be remembered that this was not a death-bed will. Testatrix lived two years and four months after it was executed, most of the time in good health. She finally died of old age and a weakened heart. The physical machinery just wore out.

This will was in line with the former testamentary dispositions of her property. Certain grandchildren objected to this will because they did not receive under its provisions as much of their grandmother's property as they expected or thought they were entitled to receive.

Much of the evidence relied on by contestants in an effort to set aside this will was trivial in its nature, and in the case of the daughter-in-law, Anna Dotterweich, mother of three of the contestants, it was clearly hostile.

While it is of course usual and natural for persons to make testamentary dispositions of their property to near relatives, there is no legal obligation to do so. There was no legal obligation resting on this testatrix to give any particular portion of her property to any particular relative, or class of relatives. If she was of sound mind when she made the will in question, and acted freely and of her own volition, she had a right to dispose of her property as she deemed best, subject to the restriction that not more than one-half should be devoted to charitable purposes. (See Decedent Estate Law, § 10; Id. § 15; since amd. by Laws of 1923, chap. 233; Id. § 17; since amd. by Laws of 1923, chap. 301.)

If Mrs. Dotterweich at the time she made this will had the

capacity to comprehend the nature of the transaction in which she was engaged, if she was able to recall her property, and knew of what it consisted, and if she knew and understood the relation she bore to those who would naturally be the objects of her bounty, then she had testamentary capacity and was capable of making a valid will, even though she was a woman of advanced age, for the highest mental capacity is not necessary to constitute testamentary capacity, and the mere fact that this testatrix was an aged woman raises no inference that she lacked capacity to make a valid will.

Our laws in their beneficence seek to assist the aged and infirm in making testamentary disposition of their property, and they do not undertake to put obstacles in their way to prevent them from doing it.

Much stress is laid by contestants on the fact that between August and October, 1920, testatrix spoke of calling on a near neighbor who had died some time previously. Of course that was proper evidence to be received on the question of testamentary capacity, but in view of the age of testatrix it was not a surprising or unusual incident, and in any event it occurred so long after the making of the will that it could hardly be said that any infirmity of mind indicated by that incident related back and actually entered into the execution of the will. Aged people are apt to be forgetful and live in the past, but that does not make them of unsound mind, and it certainly would justify no such inference in this case in view of the mass of testimony that testatrix attended to her business in her usual way up to within a very short time before her death.

The evidence fails to establish that testatrix was incapable of making a valid will on the day this instrument was executed. On the contrary, from the evidence of the subscribing witnesses, which was undisputed, supplemented by all the other evidence in the case showing testatrix's ability to do business almost up to the week of her death, and her conversations with them from time to time when they came in contact with her, the conclusion is irresistible that at the time this will was made testatrix was rather above the average of intelligence and ability considering her advanced age. (*Delafield* v. *Parish*, 25 N. Y. 9; *Matter of Snelling*, 136 id. 515; *Matter of Dunn*, 184 App. Div. 386; *Matter of Heaton*, 224 N. Y. 22; *Matter of Wolf*, 196 App. Div. 722.)

Under all the facts and circumstances as shown, the finding of the jury in answer to the second question submitted to the effect that at the time this will was executed testatrix was of unsound mind and incapable of making a valid will, was contrary

to and against the weight of the evidence, and it is disapproved and reversed.

Undue influence.

The third question submitted to the jury was whether or not at the time the will was executed decedent was acting free from undue influence.

Undue influence means any improper or unlawful constraint, urging or persuasion whereby the will of the testator is overcome and he is induced to do an act in reference to his property and its distribution which he would not do if left to act freely and of his own volition, for whatever destroys the free agency of a testator and prompts him to do what is really against his will, and which he would not have done if left to himself, is undue influence, whether exercised by physical force, by threats or by coaxing.

But not every influence exercised over a testator is undue. In order to have an undue influence exercised over a person who is about to make a will, it must be such an influence as to amount to moral coercion and must be such as to destroy the free agency of the testator and substitute the will of another in place of his own. (*Matter of Manay*, 181 N. Y. Supp. 648; *Matter of Bogardus*, 198 App. Div. 399; *Matter of Price*, 204 id. 252; *Smith* v. *Keller*, 205 N. Y. 39; *Matter of Brand*, 185 App. Div. 134; affd., 227 N. Y. 630; *Matter of McGill*, 229 id. 405; *Matter of Kennedy*, 190 App. Div. 896; affd., 229 N. Y. 567.)

It is claimed that the two daughters of testatrix received by this will the greater portion of their mother's estate, and because they lived with their mother the inference is justifiable that she was unduly influenced by them. There is no evidence in the record to justify that inference. These daughters had never married, and they naturally remained with their mother in the home their father had established. They did the greater part of the housework, and cared for their mother as she required it. It would be but natural that the mother would provide for these aged daughters who had no other means of support. There is not a word of evidence that either of them ever mentioned the subject of a will to their mother. The fact that they lived in the same house with testatrix, and might have had an opportunity to exercise undue influence over her, raises no inference that they did it. (*Matter of Woods,* 189 App. Div. 324.)

It is of course almost impossible to prove undue influence by direct and positive evidence. It must be established if at all largely by circumstances and little incidents that arise in the daily lives of the parties. But undue influence must be established

by a fair preponderance of the evidence, and the burden of establishing that proposition rests on the party who asserts it.

This opinion has already reached an unreasonable length and it will not be profitable to go further into details of the evidence and point out where it falls short of justifying the verdict that was rendered.

Why should a jury set aside this will and sustain every one of contestants' propositions in the face of overwhelming evidence that the will was duly executed, that testatrix was of sound mind, and that it was not the result of undue influence?

The answer is found in the desire of jurors in contested will cases to make a will for a decedent as they think it ought to have been made, without regard to her absolute right under the law to make such testamentary disposition of her property as she saw fit, provided she was of sound mind and acted of her own volition.

Unless we have arrived at a point in the administration of the law where we are willing to do away with the statutory right of a competent adult to make testamentary disposition of his property, we should firmly hold to the doctrine that when a testator has the capacity to make a valid will, and he acts freely, as was shown in this case by a fair preponderance of the evidence, the right to make a will should be rigidly upheld, and not be put in jeopardy by the prejudices, passions or sympathies of a trial jury.

Appellants urge that reversible errors were committed in the reception of evidence and in the charge to the jury, and one or two of the assigned errors appear to be serious, but inasmuch as we have reached the conclusion that the verdict was against the weight of the evidence on all propositions submitted, and that it cannot stand, it will be unnecessary to discuss the alleged errors in the charge and in the reception of evidence. The verdict should be set aside on the ground that the evidence is insufficient to show either lack of due execution of the will, or lack of testamentary capacity, and it was also insufficient to show that the will was the result of undue influence under the rule laid down in *Matter of Case* (214 N. Y. 199); *Matter of Heaton* (224 id. 22); *Matter of Wolf* (196 App. Div. 722); *Matter of Goodhart* (173 id. 256).

The decree of the surrogate refusing probate and the order denying proponent's motion to set aside the verdict and for a new trial are reversed on the facts and a new trial granted, with costs to appellants to abide the event, payable out of the estate.

All concur; HUBBS, P. J., not sitting.

Decree and order reversed on the facts and new trial granted, with costs to appellants to abide event, payable out of the estate.