(18 Misc. Rep. 149.)

In re HENRY'S WILL.

(Surrogate's Court, Cattaraugus County. September, 1896.)

1. WILLS—KNOWLEDGE BY TESTATOR OF CONTENTS—EXECUTION.
   Knowledge of the contents of a will is presumed where the will was prepared by an attorney at the home of testator, who was writing on the will in testator's presence when the witnesses arrived, and the will was signed by two witnesses, one of whom was testator's physician, who testified that the attorney read aloud the attestation clause, in the presence of testator and witnesses, and that testator arose from his bed, walked to the table, signed the will, acknowledged it as his last will, and requested the witnesses to sign it, which they did, in his presence and in the presence of each other,—though there is no direct proof that the will was read to the testator, or that he was fully apprised of its contents.

2. SAME—TESTAMENTARY CAPACITY—STATEMENT.
   A testator possessed testamentary capacity where he was able to personally conduct his store in a successful manner prior to and for several months after making his will, and his general conduct was such as not to excite attention, though he occasionally talked disconnectedly, and made mistakes in making change, and overlooked cash payments, and sold goods for less than their value, and spoke of his competitors as the "ring" who had combined to rob him, and manifested his eccentricities intensified by advancing age.

Proceeding for the probate of the will of Joseph Henry, deceased Granted.

A. J. Knight, G. M. Rider, and Wm. G. Laidlaw, for proponent.
J. H. Waring and G. E. Spring, for contestants.

DAVIE, S. The contestants in this case are minor grandchildren of the testator, and legatees under his will. The objections filed to the probate of the will allege—First, a failure to comply with the necessary statutory requirements in the formal execution of the will; second, that the will was procured by undue influence; and, third, that the decedent, at the time of its execution, did not possess

testamentary capacity. In view of the fact that 25 witnesses were called and examined on behalf of the proponent, and 40 on behalf of the contestants, no satisfactory analysis of the entire evidence can be presented in this decision; yet each of these three propositions will be considered to some extent.

The will bears date and was executed on the 8th day of January, 1894. The testator died at the age of about 80 years, on the 7th day of February, 1895. The will was prepared at the residence of the testator by an attorney of experience and integrity, who was present and superintended its execution. One of the attesting witnesses was the attending physician of the testator. He testified, in substance, that, after the completion of the drawing of the will, the attestation clause was read over by the attorney in the presence and hearing of the testator and the two witnesses; and that the testator arose from his bed, walked to the table, signed the will, acknowledged it to the witnesses as and for his last will and testament, and requested them to sign it as witnesses, which they each did, in his presence and in the presence of each other. The chief criticism, however, in relation to the manner of the execution of the will arises from the fact that there is no direct proof that the will was read to the testator, or that he was fully apprised of its contents. The attorney who prepared the will was not examined as a witness upon this subject. The attesting witnesses each testify that some writing was done by way of preparing the will after their arrival, and that the will was not read in their presence. It should, of course, be made to appear that the testator knew and approved of the contents of the will, and its force as a testamentary act. Williams, Ex'rs (6th Am. Ed.) 21; Rollwagen v. Rollwagen, 63 N. Y. 504. In those cases where, in consequence of the infirmities of the testator, his impaired capacity, or peculiar circumstances attending the transaction, the usual inferences cannot be drawn from the mere formal execution of the will, additional proof, either direct or inferential, is necessary showing that the testator's mind accompanied the testamentary act. Weir v. Fitzgerald, 2 Bradf. Sur. 42. The attesting witnesses testify that, at the time of their arrival, the attorney was sitting at the table, writing, and that the testator was upon the bed, four or five feet from him; that other papers, deeds, and mortgages were upon the table. The testator was not only able to converse intelligently, but to walk unassisted from the bed to the table, and write his name at the end of the will. Taking into consideration all the facts and circumstances attending the execution of the will, the mental condition of the testator as more fully referred to hereinafter, it may be reasonably inferred that testator had been fully apprised of the contents of the will before the arrival of the witnesses. Nexsen v. Nexsen, 3 Abb. Dec. 360; Worthington v. Klemm, 144 Mass. 167, 10 N. E. 522; Vernon v. Kirk, 30 Pa. St. 218.

There is no evidence directly supporting the allegation of undue influence. Under the peculiar circumstances of this case, the question of undue influence and testamentary capacity necessarily blend together. While it is not claimed on part of the contestants that the evidence shows any direct acts of coercion, it is asserted that the

testator was so enfeebled mentally and physically as to be unduly influenced by the very nature of the relations existing between him and the principal legatees. The issue of undue influence is quite distinct from that of testamentary capacity; yet the two are commonly found united and necessarily considered together. Some authorities regard a partial incapacity as a prerequisite to the existence of undue influence. Schouler, Wills (2d Ed.) § 226. The condition of the testator's mind will often determine whether a set of circumstances, ambiguous in their nature, amount to undue influence or not. The mental and bodily health of the testator will contribute to the determination of the question of whether or not he acted as a free agent. 27 Am. & Eng. Enc. Law, 505. So the principal question involved in this contest is as to whether or not, at the time of the execution of the will, the testator possessed testamentary capacity.

Before referring to the facts disclosed by the evidence, it may be well to call to mind the general rules established by a long line of decisions, determining what grade or degree of mental capacity is requisite to the due execution of a will. It is essential that the testator possess sufficient capacity to comprehend perfectly the condition of his property, his relation to the persons who were or should or might have been the objects of his bounty, and the scope and bearings of the provisions of his will. Delafield v. Parish, 25 N. Y. 9. He should be able to collect in his mind, without prompting, the elements of his business to be transacted, and hold them there until their relation to each other can be perceived, and a rational judgment formed in respect thereto. Van Guysling v. Van Kuren, 35 N. Y. 70. Again, it is said that no presumption against the validity of a will exists because made by a man of advanced age, nor can incapacity be inferred from an enfeebled condition of mind or body. Horn v. Pullman, 72 N. Y. 276; In re Snelling, 136 N. Y. 515, 32 N. E. 1006; In re Pike's Will, 83 Hun, 327, 31 N. Y. Supp. 689; In re Flansburgh's Will, 82 Hun, 50, 31 N. Y. Supp. 177.

The law does not attempt to define any particular grade of mental ability or acumen necessary to qualify one to make a will, leaving the question to be determined very largely from the particular circumstances of each individual case; yet a careful examination of the general propositions enunciated by the authorities cited will furnish a very safe guide for the disposition of the case at bar. The testator had been for many years prior to his death a farmer in the town of Farmersville, and, as such, quite actively engaged in business. For some time, however, prior to his demise, he had been engaged as a merchant at the village of Farmersville Station. He evidently was a man, when in his prime, of vigorous intellect, of strong will, industrious, thoroughly honest, but somewhat rough and abrupt in his manner of speech. He had succeeded in accumulating property to quite an extent, which consisted largely of real estate. During the last few years of his life, he had become to some extent enfeebled in body and mind, and his peculiarities of temperament much more pronounced; and the evidence on part of the contestants relates largely to instances of exhibition of such peculiarities. The evidence shows that near the close of the year 1893 he

had become somewhat weak and infirm. He complained of being unable to get about with comfort. He was untidy in his personal habits, and careless in his dress, and indifferent to some extent to his personal appearance. Certain of the witnesses speak of him as "looking wild," and talking disconnectedly and about unimportant matters. He cherished a very pronounced hatred against his competitors in the mercantile business, designating them as the "ring," saying they had combined to rob him. On one occasion, in December, 1893, he spoke of his sons being engaged in haying. He occasionally made mistakes in making change, and at times sold goods for less than their value. He was to some extent forgetful, overlooked cash payments made to him on sale of goods, and at times failed to recognize his acquaintances, and on one or more occasions asked persons calling upon him if they had come to take him to the poorhouse. Yet the evidence clearly shows that these transactions were isolated and occasional. His general line of conduct was not of a character to excite attention or comment. His lack of memory, irritability, and erroneous impressions were only such as are commonly discovered in persons of advanced age. For some considerable time after the execution of the will, testator continued his business personally, participating to some extent in carrying on his trade at the store. He sold goods, made change, settled with his customers, ordered goods for the store, and evidently exercised good judgment and discretion in making such orders. In fact, the evidence on part of the proponent makes it quite clear that, for several months after making the will, the testator's general line of conduct was entirely rational. The expert testimony regarding his mental condition comes from Dr. Smith, on part of the proponent, and Drs. Kahls and Eddy, on behalf of the contestants. Smith had had ample opportunity to form an intelligent opinion of testator's mental and physical condition from a long personal intercourse with him. He had known testator since the month of August, 1892, lived near him, was his attending physician, and had visited him professionally in the morning of the same day the will was drawn. Testator was, and for several years had been, afflicted with valvular disease of the heart. His death was occasioned by this disease, and congestion of the lungs resulting therefrom. Smith testified, among other things, as follows:

"Q. At the time you attempted the execution of the will, state whether there was anything about the physical condition of deceased that would render him mentally incompetent. A. No, sir; I don't think there was. Q. Would there be, in the nature of the diseases he suffered from, anything to produce mental difficulty? A. Nothing only what he would get from general weakness."

The examination of this witness was very exhaustive on both his direct and cross-examination, and while he states that, at the time of the making of the will, testator was somewhat enfeebled mentally, he asserts positively and unequivocally that he was still of sound mind and memory. The contestants' physicians did not assume to have any personal knowledge of the testator's condition. They gave their opinion of his mental condition upon a hypothetical statement of facts assumed to be established by the evidence on behalf of the

contestants, excluding, however, the facts established by the evidence on behalf of the proponent. While these experts are gentlemen of integrity and ability, their evidence, being a mere expression of opinion predicated upon certain facts selected from the entire volume of evidence the most favorable to the contestants, is not as satisfactory as the evidence of Smith, who speaks from actual knowledge and personal observation.

It can hardly be contended that any of the mistaken impressions entertained by the testator, especially in reference to the existence of the "ring" organized to ruin his business, amounted to what is known in law as a delusion which might incapacitate him from making a will. A delusion of that character has been defined as the conception of the existence of something extravagant, which has no existence whatever, but of which the person entertaining it is incapable of becoming permanently disabused by argument, reason, or proof. 25 Am. & Eng. Enc. Law, 982; Stanton v. Wetherwax, 16 Barb. 259. A mere mistake of fact, which is the result of false evidence, is not such a delusion. Schouler, Wills (2d Ed.) § 146; Middleditch v. Williams, 45 N. J. Eq. 726, 17 Atl. 826. Again, it has been held that one whose mind is perverted by insane delusions, with reference to one of many subjects, however unreasonable and absurd, may, nevertheless, make a valid will, provided the provisions thereof are not influenced by such delusions. 25 Am. & Eng. Enc. Law, 983. The cases illustrative of this proposition are numerous. In Re Smith's Will, 52 Wis. 543, 8 N. W. 616, and 9 N. W. 665, the testator was a spiritualist, and claimed to have received a message from his deceased wife, telling him to marry the appellant beneficiary, and who frequently consulted mediums about his business. In Brown v. Ward, 53 Md. 377, the testatrix was also a spiritualist, who believed that she communicated with the spirits, could cure the sick, and foretell future events. In Robinson v. Adams, 62 Me. 369, the testatrix believed that her son-in-law was under the control of an evil spirit. She kept a book of spiritual communications, which she considered of great value. In Lee v. Lee, 4 McCord, 183, the testator believed that all women were bewitched, would not sleep in a bed made by a woman, and imagined himself engaged in constant warfare with evil spirits. In Kelly v. Miller, 39 Miss. 17, the testator believed in witches and conjurers, and that his mother was bewitched, and that his horse and gun were bewitched, and that, when he broke bread at the table, it turned into blood. In Bonard's Will, 16 Abb. Prac. (N. S.) 128, the testator firmly believed in the doctrine of metempsychosis, and he bequeathed an estate of $150,000 to the American Society for the Prevention of Cruelty to Animals. In Re White, 121 N. Y. 406, 24 N. E. 935, the testator entertained an intense dislike of freemasonry, and of a son because he was a freemason. In all of these cases the wills were sustained. Unusual and irregular habits, known as "eccentricities," do not incapacitate one from making a will. Redf. Wills, 71; Schouler, Wills (2d Ed.) § 144; Brick v. Brick, 66 N. Y. 144.

From a careful consideration of all the evidence, I am firmly of the opinion that the will ought to be admitted to probate. Its provi-

sions are apparently reasonable, and to some extent in conformity with testator's previously expressed intent. While the will discriminates to some extent in favor of the oldest sons of the testator, such discrimination does not seem to be entirely without reason. A decree will be made admitting the will to probate, and granting letters thereon to the executor named in the will.

Decreed accordingly.