In the Matter of the Probate of an Instrument Purporting to be the Will of TIMOTHY F. McCARTHY, Deceased.
BEATRICE McCARTHY, Appellant; JAMES F. EGAN, as Public Administrator of New York County, et al., Respondents.
In the Matter of the Estate of TIMOTHY F. McCARTHY, Deceased.
BEATRICE McCARTHY, Appellant; JAMES F. EGAN, as Public Administrator of New York County, et al., Respondents.

First Department, April 20, 1945.

*Emmet L. Holbrook* for appellant.

*Joseph A. Cox* of counsel for the respondent Public Administrator; and *Jacob I. Goodstein,* special guardian, respondent; (*Joseph T. Arenson* and *Isidore Zamore* with them on the brief), for respondents.

DORE, J. Petitioner, proponent of a document claimed to be the last will of Timothy F. McCarthy, deceased, appeals from Surrogate's decree denying probate entered on a general verdict after a jury had found special verdicts of lack of testamentary capacity and undue influence.

The conflicting evidence on the trial presented issues of fact on testamentary capacity and undue influence which were submitted to the jury for its determination; and as there is ample evidence to support the jury's verdict, the decree entered thereon should not be disturbed unless there is found, as appellant earnestly contends, serious prejudicial error requiring reversal. The trial lasted four days; proponent called ten witnesses, contestants, fourteen; both sides adduced a great mass of evidence. Accordingly, only so much of the voluminous record will be summarized as is essential to intelligent understanding of the grounds alleged for reversal.

Timothy F. McCarthy, the deceased, lived with his first wife, Mary McCarthy, for sixty-six years. This appellant, then Beatrice Crotty, acted as nurse for Mary McCarthy for a week or two until Mrs. McCarthy's death on July 5, 1941. Thereafter appellant remained in the home with McCarthy, as his nurse and housekeeper.

The gist of the testimony for the appellant was that at all times McCarthy was possessed of complete testamentary capacity, knew his own mind, was vigorous for his age, thought highly of proponent who had nursed his wife in her last illness and

had been kind to him and took good care of him during his own illness; and that the will was freely made without any undue influence or domination. The substance of contestants' evidence was that after his wife's death McCarthy did not want appellant in his home and tried to get rid of her but could not; that at the time he signed the propounded paper giving to appellant his entire estate of about $35,000 including all he had recently received from his wife's estate, McCarthy was an aged man of eighty-three years, physically and mentally weakened by serious prolonged illness from which he never recovered; that he was childish, senile, mentally disoriented, his utterances and acts irrational; that he was easily subject to domination by appellant who had ample opportunity as she lived with him in his home as his nurse during all the times in issue.

Concededly after his wife's death, McCarthy became seriously ill and was under the constant care of a physician who attended him at his home frequently, for months almost daily. Thus the doctor came every day in September, 1941, 23 days in October, 16 in November, 15 in December, 11 in January, 1942, 21 in February, 11 in March, 11 in April and daily from May 1 to May 8, 1942, when McCarthy died.

The propounded document, dated October 31, 1941, left decedent's entire estate to appellant who was also named sole executrix. On October 6th and October 22, 1941, two other documents had been signed by McCarthy giving his whole estate to appellant except that she was not named as executrix.

On January 5, 1942, McCarthy applied for a marriage license; and on January 8, 1942, when he was about 84 years old and appellant 46, a church marriage ceremony was solemnized between them.

McCarthy had in his own name savings bank accounts of about $18,000. He also had inherited about the same sum from his deceased wife. After the marriage with appellant, the bank accounts in McCarthy's own name were changed to joint accounts in the names of himself and appellant, payable to the survivor.

Named executor and sole legatee of his deceased wife's will, McCarthy, from his youth an actor, on the recommendation of the Actors' Fund retained the Fund's attorney, one Jacob Goodstein, to probate the will. Goodstein did so and was taking the usual steps for administering and closing Mrs. McCarthy's estate when a dispute arose. In October, 1941, McCarthy wrote a note discharging Goodstein and directing him to turn over all papers including the bankbooks to another attorney, Max Paley, the lawyer who drew the propounded document and attended at the execution thereof.

On McCarthy's behalf, Paley instituted a formal proceeding in the Surrogate's Court to fix Goodstein's fees and compel him to turn over the papers. In that proceeding Goodstein waived any fee for himself, but seriously questioned whether McCarthy was then able to look after his own affairs and suggested that McCarthy appear before the Surrogate so that the court could protect his interests. On the day agreed on for his appearance, a doctor's certificate was produced stating he was unable to attend.

Thereafter the Surrogate, on the consent of all parties and their attorneys in that proceeding, sent Mr. Kieran, a law assistant of the Surrogate's Court, to McCarthy's home on November 24, 1941. The attorney and counsel for McCarthy as well as Mr. Goodstein were present and also Dr. McTague, McCarthy's physician; appellant and one Mr. Dickson were in the living room or the adjoining room during the hearing. McCarthy was questioned by Mr. Goodstein and by Mr. Chapman, his own counsel; the law assistant also asked a few questions; the record was taken by a stenographer.

At that hearing McCarthy said he knew Goodstein for forty years, whereas the fact was that he first met him in July, 1941; that Goodstein had told him seven months before at Sixth Avenue and 50th Street that he would get McCarthy a million dollars; that he knew Wiener about nineteen years, having first met him when McCarthy was with George Cohan in one of his shows, whereas the fact was that Wiener was associated with Goodstein; that he just learned that Mr. Goodstein was acting as the lawyer for his wife's estate and did not know it " up to now ", whereas Goodstein had been acting as McCarthy's attorney since his wife's death in July, 1941. McCarthy told his own counsel that he went down to Goodstein's office because he heard " they were putting out some plays, and I went down myself to see if there was any part in my line." He stated that he knew Mr. Kieran, the law assistant, for many years, that he

was " a very good manager, and he was a good many years with George M. Cohan," whereas he was never with Mr. Cohan and had never met McCarthy before in his life. McCarthy also denied reading papers which he concededly had read only a few minutes before and showed in other ways mental confusion and lack of orientation in respect of persons and his surroundings. In parts of his testimony, however, he answered rationally, intelligently, at times even forcefully, and wrote out in longhand at Goodstein's request a letter substantially the same as the one he had previously sent discharging Goodstein and substituting Paley as his attorney.

This hearing, which now is denounced as an unwarranted inquisition, was taken on the express consent of all parties to the prior proceeding and questions and answers from it, including Mr. Kieran's brief testimony, were received in evidence on this trial without any objection whatever to any part of it by appellant. Both sides read into evidence such parts of the minutes as were deemed helpful to their respective contentions and then asked questions thereon. The admission into evidence of the questions and answers at the hearing on November 24, 1941, affords no ground for reversal of this decree. It is immaterial that appellant was not a formal party to that prior proceeding. Declarations of the testator before, at or after the making of the will, while incompetent to prove external facts, are admissible on the issues of mental competency or undue influence. (*Matter of Woodward,* 167 N. Y. 28, 30; *Matter of Limberg,* 277 N. Y. 129, 133; *Matter of Putnam,* 257 N. Y. 140, 144; *Smith* v. *Keller,* 205 N. Y. 39, 49; Note, 79 A. L. R. 1459.) Whether the declarations are too remote in point of time to have a legitimate bearing on the issues is for the court. In *Matter of Woodward (supra)* CULLEN, J., said: " It is settled law in this State that declarations of the testator, while incompetent to prove external facts, are admissible on questions of mental competency or undue influence: ' Because as is said by Jarman in his work on Wills, " The amount of undue influence which will be sufficient to invalidate a will must of course vary with the strength or weakness of the mind of the testator." So the mental strength and condition of the testator are directly in issue in every case of alleged undue influence; and the same evidence is admissible in every such case, as in cases where insanity or absolute incompetency is alleged.' "

Witnesses had testified on both sides that McCarthy's acts and utterances impressed them as rational or irrational at the times they observed him. That testimony, however, depended

on the accuracy of the witnesses' memory and the correctness of their impressions which might be erroneous though made in perfectly good faith. But the questions and answers read from this hearing furnished the jury direct evidence of McCarthy's own utterances taken down by a stenographer in the presence of his attorney and counsel about three weeks after execution of the proposed will. Though that evidence, with the appropriate questions and answers based thereon, when considered with the rest of the testimony, left the issues of testamentary capacity and undue influence for the jury, it was impressive proof of McCarthy's actual mental condition at a time sufficiently close to the claimed will to make it entirely relevant and material. The evidence was properly received. Indeed to have excluded it would have been prejudicial reversible error.

The law assistant was merely authorized to be present at the taking of the testimony and not to act in any judicial capacity; the testimony taken and its probative value were for the trier of the facts. (*Matter of Hutchings*, 61 Hun 625, General Term, First Department opinion in 16 N. Y. S. 36.)

Appellant also contends that Exhibit 26 was received in evidence at the trial in the same form as printed in the case on appeal, was considered by the jury and is patently prejudicial. When the attorney for the Public Administrator offered in evidence papers in the proceeding to determine Mr. Goodstein's compensation, the Surrogate *suo motu* expressly excluded from the record the *minutes* of the hearings in that proceeding and then suggested that the papers offered be specifically identified. Thereupon the attorney specified the papers he offered in evidence from the file — the petition, citation and certain affidavits and letters. These papers, concededly containing nothing prejudicial, were received in evidence without objection. Although the minutes of the hearings had been thus expressly excluded by the court itself when Exhibit 26 was offered in evidence, that exhibit, consisting of 122 printed pages of the case on appeal, contains *nothing but* the minutes of the hearings, the colloquy and the Surrogate's opinion in the prior proceeding. This inclusion in the record was pursuant to written stipulation, dated October 15, 1943, providing that Exhibit 26 be omitted from the printed case on appeal " *excepting the minutes* of the hearings of November 24, 1941, December 3rd and December 22nd, 1941, which are to be printed." These minutes thus printed as part of Exhibit 26 in the record do contain in places prejudicial matter including the opinion of the Surrogate in the prior proceeding that he was convinced McCarthy was, at the

time in question, incapable of handling his own affairs. If the exhibit as printed was actually received in evidence and made accessible to the jury, that alone would justify reversal of this decree. Appellant's counsel, who was not her trial counsel, con·tends that the exhibit as printed was received in evidence, seen and read by the jury. Respondents' counsel who were present at the trial allege that the inclusion of the hearings in the printed record as part of Exhibit 26 was " by error " and that no part of that material was either admitted in evidence at the trial or made accessible to the jury.

The trial record demonstrably supports respondents' contention. Exhibit 26 as printed, containing the excluded minutes, was not received in evidence at the trial but was expressly excluded by the Surrogate; it was included in the printed case on appeal by manifest error when the above stipulation was made a year after the trial. Further, the trial record contains no notation that the jury during their deliberation called for any of the exhibits that actually were in evidence or that any exhibits were sent to the juryroom. Finally, when the jury's verdict was received, appellant's trial counsel in his motion to set aside the verdict made no claim that exhibits not in evidence or any exhibits containing prejudicial matter had been seen by or made available to the jury. Appellant's contention on appeal does not stand analysis in the light of the record at trial, and should be overruled as neither established nor timely.

What is said of Exhibit 26 is equally applicable to Exhibit 24 only four lines of which were actually admitted in evidence at the trial.

Further objection is made that the verdict should be set aside as inconsistent, as the jury found McCarthy did not possess testamentary capacity and also found that the will was procured by undue influence. However, when the special verdicts were received, contestants immediately moved for a general verdict thereon and that motion was granted. Either finding supports the general verdict denying probate of the will. (*Matter of Mauran,* 248 App. Div. 650, affd. 272 N. Y. 567.)

There was no error in refusing to charge in the language requested regarding the presumption of sanity. Testamentary capacity was in issue, not insanity as such, and the two are distinct. (7 Wigmore on Evidence [3d ed.], § 1937.) The Surrogate did charge: " The presumption is that a mind once sound continues, but the evidence may overcome that

presumption and the burden of showing that soundness of mind exists is upon you [proponent's counsel] and your client, Mrs. McCarthy." That charge was correct. (*Delafield* v. *Parish*, 25 N. Y. 9, 29, 30; *Rollwagen* v. *Rollwagen et al.*, 63 N. Y. 504, 517; *Matter of Mullin*, 143 Misc. 256, 258, affd. 240 App. Div. 996, affd. 265 N. Y. 491; 1 Jessup-Redfield on Law and Practice in Surrogates' Courts, § 387.)

Appellant also contends that the special guardian for unknown heirs at law and next of kin who might be infants or incompetents and the Public Administrator were not authorized to appear and contest probate. Both contentions should be overruled. The special guardian was duly appointed and did appear; his appearance was noted; he made an opening statement and summation; took part in the trial and no objection was made. Appellant did move to strike out the Public Administrator's appearance but an order was entered denying that motion (*Matter of McCarthy*, 178 Misc. 1004); appellant did not appeal from that order, and did not specify it in connection with this appeal from the final decree and it cannot now be reviewed. (Surrogate's Court Act, § 295.)

Other objections are urged regarding claimed error in the admission of evidence. Assuming that some small part of the testimony was improperly received, we think appellant was not necessarily so prejudiced as to authorize, under section 294 of the Surrogate's Court Act, reversal of the decree admitting the will to probate. As CULLEN, J., said in *Matter of Woodward* (167 N. Y. 28, 31, *supra*): "In a case of probate where want of testamentary capacity and undue influence are charged, much latitude in the introduction of testimony must necessarily be allowed to the parties." The trial court applying that rule allowed each side ample latitude to adduce evidence that reflected any light on the mental condition of the testator at or about the time of the making of the will.

From time to time the learned Surrogate did take hold to examine witnesses, at times vigorously, but this action served to expedite the trial and further ascertainment of the ultimate facts bearing on the issues presented. An experienced trial judge should not resign himself to the position of a mere automaton. (1 Wigmore on Evidence [3d ed.], § 21, p. 374.) During the trial, the jury were repeatedly admonished to keep their minds open until all the evidence was in. In the charge they were instructed that they were the sole judges of the facts, that on the two questions submitted to them the responsibility was wholly theirs, and that they were not to be swayed by sympathy for

either side or by prejudice or bias against any party or any person interested. They were further instructed not to be controlled by the court's recollection of the facts but, if necessary, to correct it by the entire recollection or memory of the jurors and not to let their verdict be affected by any of the court's rulings except on the exclusion of evidence. They were also told in what was characterized by the court as "another important instruction" that under the law, if McCarthy was of sound mind and not unduly influenced, he had "the right to dispose of his property, to give it away to anyone he selects, and we do not sit here in judgment on what we would have done under other circumstances." On the whole record it may not properly be said that the Surrogate unduly interfered with the trial or improperly invaded the jury's province, so as to require a new trial.

In *Matter of Barney* (185 App. Div. 782, 794) this court said of a will contest: "The well-settled rule in this class of cases is that if there be more than a mere scintilla of evidence tending to show incompetency to make a will and of such a character that different inferences may fairly be drawn therefrom, the case must be decided as one of fact and if the trial be before a jury it must be left with the jury." In *Hagan* v. *Sone* (174 N. Y. 317, 323) the Court of Appeals stated the rule as follows: "Questions of fact arising in an action to determine the validity of a will are no different in this respect from questions of fact in any other case. When evidence is given of such a character that different inferences may fairly and reasonably be drawn from it, the fact must be determined by the jury. The good sense of the jury, when aided by proper instructions from the court, is the best and, indeed, the only protection that litigants ordinarily have in the determination of issues of fact, depending upon conflicting evidence, even when such issues arise in actions to determine the validity of the most important testamentary instruments."

The final determination of the issues in this case depended on the good sense of the jury and their inferences from the over-all picture presented by the evidence.

On the entire record, we may not say the jury's verdict was against the evidence or the weight of the evidence. The decree denying probate should be affirmed.

Claiming that, as widow of Timothy F. McCarthy, deceased, she should have been appointed administratrix of his estate, appellant also appeals from an order issuing temporary letters of administration to the Public Administrator. At the hearing

on the order to show cause, the then attorney of appellant did not oppose the application, stating the only objection would be the matter of expense but if the Surrogate thought the motion to appoint the Public Administrator should be granted, " let it be granted ". The issue was thus left entirely to the court. In view of all the facts and circumstances, we cannot say the court abused the discretion.

The issue of appellant's status as wife is not presented or passed upon in the appeal from the order issuing temporary letters to the Public Administrator or in the appeal from the decree denying probate.

The decree and order appealed from should be affirmed, with costs.

MARTIN, P. J. (dissenting in first above-entitled proceeding). The widow of Timothy F. McCarthy, also known as Charles F. McCarthy, offered his will for probate. The Public Administrator filed objections. Thereafter a special guardian, appointed for " the infants and the incompetents herein, if any, who and whose names are unknown ", filed objections similar to those interposed by the Public Administrator. The matter was submitted to a jury which, by a ten to two verdict, answered the following questions in the manner indicated: " No. 5. At the time of the execution of said paper on the 31st day of October, 1941, was the said Timothy F. McCarthy of sound mind and competent to dispose of his estate by will? Answer: No. No. 6. Was the execution of said paper caused or procured by the undue influence of any person or persons? Answer: Yes."

Mr. McCarthy, a retired actor, died May 8, 1942, in his eighty-third year. His first wife, to whom he had been married for about sixty-six years, died July 5, 1941. On January 8, 1942, he married a second time. His second wife had served as nurse during the illness of his first wife and after the latter's death had continued to reside with the surviving husband as housekeeper or nurse.

There is no proof that Mr. McCarthy left any relatives. There is testimony that he stated that he had a sister. He had not been in communication with his family in Boston for over sixty years, having become estranged when he adopted the stage as his vocation, and he had not seen his sister during the period of the estrangement. Although diligent inquiry has been made, no surviving relatives have been discovered. Assuming the survival of the sister mentioned by Mr. McCarthy, in the absence of a will the second wife would be entitled to the bulk of the estate.

The instrument presented for probate was signed and executed by Mr. McCarthy on October 31, 1941. By it he left his entire estate to the proponent of this will, who was then his nurse. Before executing the instrument dated October 31, 1941, it is important to note that two other wills making the same disposition of his property had been executed, one on October 6, 1941, on a printed form filled in in his own handwriting and one on October 22, 1941. The three wills are similar in all respects except that in each a different executor was named by Mr. McCarthy.

The testimony of the witness Mary E. Miner as to the circumstances surrounding the preparation and execution of the first will leaves no doubt that Mr. McCarthy was rational and had a clear and sustained intention to leave whatever he had to his nurse. This witness had known Mr. McCarthy and his first wife for a number of years and met them on the street two or three times a week. There is nothing in the record to identify Mrs. Miner as a friend of the second wife or in any way interested. Following the death of his first wife and at the request of Mr. McCarthy, Mrs. Miner became a visitor to his home. She testified that during such visits the nurse " would ask me if I would stay with Mr. McCarthy and keep him company while she went out to the store."

On October 6, 1941, while Mrs. Miner and Mr. McCarthy were alone in the apartment, he asked her what she thought about his making a will leaving all his property to his nurse (the proponent), to which Mrs. Miner replied that " it was all right." While Mrs. Miner was seated in the living room Mr. McCarthy went into an adjoining room, brought out a printed form of will, filled it out and asked her to read it but she declined to do so. Mr. McCarthy then told her that Mr. Dickson (the other witness) would be there that evening and asked her if she would stay so she could sign the will as a witness with Mr. Dickson. She remained and, after Mr. Dickson arrived later in the evening, the first will was executed.

All of the writing on this printed will, with the exception of the signatures of the witnesses, was in the handwriting of Mr. McCarthy. The will named " Mr. Jacob Goodstein " as executor; gave Miss Beatrice Crotty (the proponent of the will now under consideration) " all personal Property and what ever, cash I have left behind after my demise ". The will referred to Miss Crotty as " a good friend of my late Wife (Maud & myself)" and left to her discretion " the Masses " to be said for him and the late Mrs. McCarthy. It cannot be said that the

execution of this will was the result of any plot or conspiracy between Mr. Paley and the proponent, for the reason that Mr. Jacob I. Goodstein, at that time Mr. McCarthy's attorney, was named as executor and Mr. Paley was not mentioned in the original will. The latter's name was subsequently written above that of Mr. Goodstein as executor.

Mrs. Miner also witnessed the second will. She testified that three or four days before October 22, 1941, Mr. McCarthy told her that he had had Mr. Paley, his lawyer, up to see him; that he told Mr. Paley he wanted a legal will, and that the lawyer was going to draw a legal will for him. Mr. McCarthy asked Mrs. Miner if she would "mind again to sign it". She said "Certainly." On October 22d she arrived at the McCarthy home in the afternoon as usual and remained until the evening. When Mr. Paley, the attorney, arrived he produced the will from his brief case, gave the original to Mr. McCarthy and a copy to each of the witnesses; the attorney asked Mr. McCarthy to read the will. Mrs. Miner asked the attorney to read it aloud so that the witnesses who had copies could follow him as he read. The will was read aloud and Mr. McCarthy then signed and it was properly witnessed by the two witnesses. Mrs. Miner was not a witness to the third will which was offered for probate, but the testimony of the witnesses to that will establishes that this too was read and Mr. McCarthy stated he understood it and that its terms expressed his wishes.

Max Paley, the attorney who prepared the second and third wills, corroborated Mrs. Miner as to the reading and execution of the second will. He testified also to the reading and proper execution of the third will. Mr. Paley did not learn of the first will until this proceeding had been instituted. As to the preparation of the second will, his testimony is that Mr. McCarthy gave him his ideas as to what he, Mr. McCarthy, wanted, stating that his first wife had promised the nurse that, if she looked after Mr. McCarthy after she (the first wife) had gone, she would be repaid; that it was his wish, also, the same as his first wife's, to see that she was repaid for what she was doing and that he wanted to give everything he had to her. At Mr. McCarthy's request, Mr. Paley consented to being named executor. Mr. Paley further testified that the change of executor in the third will was made because Mr. McCarthy asked him to make the change for a sentimental reason. Mr. Paley's testimony is that all instructions about the wills were given by the testator and that he never talked with the proponent about the wills or any changes therein.

The question of fraud was withdrawn from the jury, as was the issue as to Mr. McCarthy's knowledge of the contents of the instrument, the latter question being withdrawn as being included in the question of competency. The questions submitted to the jury related to testamentary capacity and undue influence.

In July, 1941, at the suggestion of the Actors' Fund of America, Mr. Jacob I. Goodstein was retained by Mr. McCarthy to serve as attorney for him as executor of the will of his first wife. As late as October 21, 1941, Mr. Goodstein dealt with Mr. McCarthy as a person qualified to discharge the duties incident to the handling of an estate; he raised no question of mental capacity until Mr. McCarthy, alarmed at what he believed was Mr. Goodstein's unnecessary retention of savings bankbooks, attempted formally to discharge him. Mr. Paley, as attorney for Mr. McCarthy, moved to fix the fee of Mr. Goodstein as attorney for the executor of the estate of the first wife and then, *for the first time,* Mr. Goodstein raised the question of Mr. McCarthy's competency. This was not until November 14, 1941.

There then followed what has been characterized by the appellant as the inquisition of November 24, 1941, when the law assistant of the Surrogate presided at a hearing in the home of Mr. McCarthy. This hearing took place six weeks after the first of the three wills had been executed and three and one-half weeks after the last will, the will now offered for probate, was made. Other than the testimony of what occurred at this hearing when Mr. McCarthy was confused, as shown by some of his answers, there is no direct proof of mental incapacity at any time. It may well be that the attendance at his home of a delegation, including the law assistant to the Surrogate, a stenographer, his physician, three attorneys (one of whom he had recently discharged) and the lengthy questioning which ensued in the presence of his physician, were sufficient to cause a man over eighty years of age to become nervous and confused.

Many of the witnesses called by the contestants positively stated that Mr. McCarthy was rational at all times.

Reverend Joseph A. Heaney testified that he knew Mr. McCarthy for perhaps six years and that he talked to him frequently up to August 25, 1941, when Mr. McCarthy moved from West 176th Street to West 148th Street, New York City. He said that in his opinion Mr. McCarthy was " rational ", that his mind was clear, that " He was capable of forming a judgment " and " he was most clear in his talk to me, he impressed me very favorably."

Reverend John F. Warren testified that he knew Mr. McCarthy and his first wife for four or five years. He stated that it was on his advice that Mr. McCarthy moved from his home on West 176th Street in August, 1941. Thereafter and on three occasions (once by messenger and twice by mail) Mr. McCarthy asked Father Warren to visit him at his West 148th Street home. Mr. McCarthy later requested Father Warren to perform the marriage ceremony, which he did on January 8, 1942, after the marriage license had been personally obtained by Mr. McCarthy. Father Warren testified that he had attended Mr. McCarthy up to the day before his death; that he knew him intimately and that his acts and conversations impressed him as absolutely rational.

Dr. William F. McTague, called by contestants, testified that he met Mr. McCarthy when the latter called upon him in June, 1941, for the purpose of having the doctor call to see his wife who was ill. He stated that he urged the elderly couple to hire somebody to help them — not so much a nurse as one to render general care and housekeeping. He noticed that the house " was very dusty and dirty and neglected, very much neglected," and Mr. McCarthy " looked like a neglected old man." After the death of his first wife, Mr. McCarthy moved to West 148th Street and Dr. McTague then noticed that the old man was " cleaner " and the apartment was kept in " good condition, clean condition, and bright and cheerful." He testified that the illness for which he treated Mr. McCarthy did not have any direct effect on his mental condition, that there was no marked hardening of the arteries. He further stated that Mr. McCarthy was rational continuously from June, 1941, when they first met, until May, 1942, when he died, with the single exception of his confusion on November 24, 1941, more than three weeks after the proposed will was executed. Under pressure on the part of the trial court, Dr. McTague reluctantly admitted that some of Mr. McCarthy's answers at the November 24, 1941, hearing were irrational. He characterized the condition of Mr. McCarthy at that time as temporary confusion.

Samuel S. Fein, the druggist who filled prescriptions for Mr. McCarthy, testified that the latter would visit him at his place of business sometimes every day, sometimes every other day and sometimes a couple of times a week, and engage in conversation; that Mr. McCarthy would be left by his nurse in Fein's store while she went out to do some shopping. Fein always greeted Mr. McCarthy and on three or four occasions had talks with him about his stage career. This witness testified that the acts and conversations of Mr. McCarthy were rational.

Eli Fein testified that he was the son of Samuel S. Fein. He, too, was a druggist and occasionally he saw Mr. McCarthy in the drug store. He was also a notary public and in September, 1941, he notarized Mr. McCarthy's signature on some papers. In his opinion, Mr. McCarthy's conduct was rational.

In addition, the superintendent of the apartment house in which Mr. McCarthy resided, the barber who shaved Mr. McCarthy, and several other witnesses were of the opinion that although old, Mr. McCarthy was, in all respects, rational.

The aged Mr. McCarthy was probably lonesome after the death of his first wife, with whom he had been so closely associated for over sixty years. He may have desired assurance that the nurse who had taken care of his wife in her illness would take care of him for his few remaining years and, having no relatives, was quite content that she should take his entire estate. Father Warren testified that Mr. McCarthy praised the proponent for her kindness to him and said if he possibly could he would like to repay her. It is true that this old man married a woman many years younger than himself, but many other old men, desiring companionship and the care of a capable woman, have taken the same course and have not been considered irrational for so doing.

On the other hand, there is some testimony of avarice on the part of the proponent. Avarice is not uncommon, in fact it is a weakness of human nature that is prevalent. A witness testified that on one occasion soon after the death of his first wife Mr. McCarthy locked the proponent out of his apartment and stated he did not want her there, and that, when the superintendent said he had no authority to admit her, she went through another apartment and gained access to the decedent's apartment by way of a fire escape. Other witnesses testified that the proponent stated that she was staying on whether she was wanted or not and, if she was not paid, she could recover from the estate. Following the marriage on January 8, 1942, the bank accounts in the individual name of Mr. McCarthy were changed to a new account in the name of Mr. McCarthy and his new wife as joint tenants with survivorship, and shortly after his death these accounts were the subject in part of withdrawals and in part of transfers of the balances to her in her individual name. It is important to note that although the proponent is charged with being avaricious, she made no withdrawals from the bank accounts of the deceased under the power of attorney which she had received from Mr. McCarthy on October 7, 1941.

The testimony in the record establishes that Mr. McCarthy was rational at the time of his marriage to the proponent on January 8, 1942, more than two months after all three wills had been executed. The testimony and the evidence show that Mr. McCarthy personally attended at the office of the city clerk and obtained the marriage license after answering the necessary questions, which required a clear mind to enable him to give the proper information; he took the initiative in arranging for Dr. McTague to take Wassermann tests and also arranged with Father Warren for the wedding ceremony. The direct proof also establishes that Mr. McCarthy was rational on the day he executed the will offered for probate, which was similar, except for the executor named therein, to the two earlier wills executed by him.

The contestants conceded that Mr. McCarthy was competent during the early part of September, 1941. As to this there appears to be no question. In fact, the Surrogate said: " * * * You have a concession here that he was competent up to at least August, 1941, until the time he got severely ill. * * * . Perhaps until September, the contestants all concede that, early September."

Correspondence dated September and October, 1941, between Mr. McCarthy and Mr. Goodstein, who now contends that the former was not competent to make a will, conclusively establishes that during those months Mr. Goodstein considered Mr. McCarthy rational and competent.

In a letter dated September 10, 1941, Mr. Goodstein sent Mr. McCarthy what he called a " non-military service affidavit "; he requested Mr. McCarthy to sign it " at the place marked by your initials and go before a Notary Public and have it sworn to and return to me promptly." In the same letter he asked Mr. McCarthy to " fill in what you believe to be the present age of Mrs. Farrell," a sister of testator's first wife residing in Australia.

On September 16, 1941, Mr. Goodstein again wrote to Mr. McCarthy. This time he asked the latter to execute an affidavit " which the Surrogate Court requires." He said: " This affidavit refers to the letter which Mrs. McCarthy wrote and which was in the safe deposit box and which you will recall stated that none of her relatives in Australia were to receive any of her property. Will you please sign this on the place marked by your initials, have the same sworn to before a Notary Public and return to me at once."

Mr. Goodstein wrote Mr. McCarthy on September 24, 1941, informing him that Mrs. McCarthy's will had been probated and that Mr. McCarthy had been appointed executor of the estate. He informed Mr. McCarthy that the safe deposit box was to be opened September 29, 1941, and asked Mr. McCarthy to be present at that time. Mr. McCarthy was present on that occasion as requested. In the same letter Mr. Goodstein stated that " there are several matters concerning the estate which I should like to talk to you about personally " and he asked Mr. McCarthy to telephone and make an appointment.

As late as October 21, 1941, Mr. Goodstein wrote a letter to Mr. McCarthy containing, in part, the following: " It will be necessary for you to go to the Corn Exchange Bank and to open Mrs. McCarthy's box in order to obtain the United States Postal Savings certificates which will have to be delivered to the post office department for surrender in order to obtain the money therein.

" Will you please have Miss Crotty call me and let me know when it will be convenient for you to go so that Mr. Wiener can meet you, and at the same time, have some of the other papers signed. * * * ."

The following day, October 22, 1941, Mr. McCarthy wrote a letter to Mr. Goodstein on the letterhead of " Max Paley, Attorney at Law, 545 Fifth Avenue, New York." At the bottom of the letter Mr. McCarthy acknowledged his signature before a notary public. The letter reads:

" Re: ESTATE OF MARY McCARTHY.

DEAR SIR:

This is to notify you that I have retained Max Paley as my attorney in the above Estate, and do not wish you to render any more services on my behalf in said Estate.

Will you therefore be good enough to turn over to Mr. Paley all papers, bank books, records, documents, etc. that you have in your possession."

Mr. Goodstein testified that upon receipt of the above letter he directed his managing clerk, Mr. Isaac Wiener, " to go up and see Mr. McCarthy ". Thereafter Mr. Goodstein received the following letter written entirely " in Mr. McCarthy's handwriting " and addressed to " Mr. Goodstein " under date of " Nov. 3rd 1941 ":

" DEAR SIR,

When I spoke to Mr. Wiener today, I told him I did not write a certain letter — However it thoroughly expresses my desires — I signed the letter. It was prespared at my request.

So pleace give all the Papers &c. to Mr. Paley, whom I told Mr. Wiener, I had alrready engaged to represent me in all matters

Very Truly Yours
TIMOTHY F. McCARTHY
545 W. 148 St.''

It should be noted that the letter of October 22, 1941, discharging Mr. Goodstein as attorney was written about two weeks after the execution of the first will which named Mr. Goodstein as executor and on the same day that Mr. McCarthy executed the second will. The letter discharging Mr. Goodstein was written and the second will was executed at a time when no question had been raised about Mr. McCarthy's competency. From the language of his letters to Mr. McCarthy and the requests he made of Mr. McCarthy to execute various affidavits, Mr. Goodstein must have been firmly convinced that Mr. McCarthy was then a very rational and competent person.

In connection with the fact that the will offered for probate is almost identical in form with two prior wills executed at a time when there can be no question but that Mr. McCarthy was rational, attention is directed to *Matter of Dunn* (184 App. Div. 386). The court there held that a prior will made at a time when it is conceded that the testator was in full possession of his faculties has a bearing upon the question of the attitude of the testator toward his family and is admissible in evidence. At page 390 the court said: '' Where a will, made by a concededly competent person, is identical in its scheme with that of a subsequent will, varying merely in detail, and the details of which are not unreasonable or freaky, the natural inference would be that the later will was merely the result of maturer deliberation, not that it was the result of irrationality on the part of the testator, or fraud on the part of those who chanced to be benefited by the changes.''

On this appeal the proponent contends that she was not accorded a fair trial. She claims the Surrogate displayed '' open hostility '' to her and her attorney, that he interfered with the examination and cross-examination of witnesses and by his rulings and statements indicated that in his opinion Mr. McCarthy was incompetent to manage his own affairs, that Mr. Paley and the proponent were seeking to obtain Mr. McCarthy's money and that undue influence was practiced upon Mr. McCarthy.

On that subject the record speaks for itself and discloses that **the Surrogate participated actively in the trial, frequently**

taking over the examination and cross-examination of witnesses

The learned Surrogate also made comments and observations which are claimed to have been prejudicial to the proponent of the will, which need not be here set forth. A judicial officer should not be indifferent and wholly negative during the progress of a trial, but there must be an attitude of clear impartiality. A trial judge should never fail to control the conduct of the trial nor hesitate to guide its expeditious and orderly procedure in the interests of justice. But in certain respects which the record discloses, the learned Surrogate, no doubt unwittingly and with the best of intentions, may have passed the boundary of judicial impartiality. For this reason, the judgment might be reversed. However, there are other grounds requiring a reversal of the judgment, and these will now be referred to.

Mr. McCarthy, as executor of the estate of his wife, moved, through his attorney, Mr. Paley, to have fixed the compensation of Mr. Goodstein for services rendered as attorney for the estate. In connection with that application, the Surrogate directed his law assistant to conduct an examination of Mr. McCarthy at the latter's home. In explanation of that designation the Surrogate said: " Under the law we have the power, as the Surrogate cannot go himself, to designate one of our law assistants to take our place and to take the testimony, and it comes back to us."

The examination of Mr. McCarthy, so ordered, was held on November 24, 1941. Considerable stress has been laid on the testimony taken at that time. In his charge to the jury the Surrogate said: " Whatever may be said of the other evidence in the case, it depends in great part upon the recollection of the witnesses, but what happened on November 24th at the house of Mr. McCarthy, when he was there examined, is a matter of official record, and you have heard the questions and answers that were given by him and the statements of the attorneys, and Mr. Kieran there, read to you. \* \* \* So you may examine that testimony taken up there, which may be important to you to find out whether this man did not have any idea or orientation, that he did not recognize people."

The opinion of the Surrogate refers to the examination in the following language: " The minutes of that examination must have had an impressive effect upon the jury's verdict for they showed an entire lack of orientation on the part of the testator at the hearing, mental confusion, misunderstanding of papers which he had signed and sworn to, \* \* \* and other statements which impressed those who heard them as **irrational.**

" Along with the other evidence in the case, the minutes of these proceedings strongly support the finding of the jury that the testator was of unsound mind at the time of the execution of the alleged will."

On the trial of this proceeding, the contestants called Mr. Kieran, the Surrogate's law assistant, as a witness. He testified in part as follows: " Q. Mr. Kieran, did the questions and answers given by Mr. McCarthy which you heard in testimony on November 24, 1941, at Mr. McCarthy's home, impress you at the time as being rational or irrational? A. Irrational."

The introduction of Mr. Kieran as a witness for the contestants, with the repeated emphasis on his official capacity as the law assistant to the Surrogate, and his testimony as to the mental condition of Mr. McCarthy are of doubtful legality. This is particularly so in view of the fact, with the stress laid upon it, that he acted as the representative of the Surrogate at the time of that examination. Had the Surrogate personally conducted that examination, the requirement that while acting as trial judge in the present proceeding he be wholly impartial would have precluded him from becoming a witness and testifying that in his opinion the answers of Mr. McCarthy were irrational.

This is an elementary principle which has been recognized in New York State since early times. (*Morss* v. *Morss,* 11 Barb. 510 [1851].) The opinion of PARKER, J., who wrote for the court in that case, has been frequently quoted by the courts in other jurisdictions. Thus, in the case of *Estes et al.* v. *Bridgforth* (114 Ala. 221, 226), COLEMAN, J., writing for the Alabama Supreme Court in a contested probate proceeding, held that reversible error had been committed by allowing a probate judge to testify to a conversation had with the decedent upon the issue of the latter's testamentary capacity. The opinion reads in part as follows: " In the case of *Dabney* v. *Mitchell,* 66 Ala. 495, 503, this court used the following language: ' Though, as is said by PARKER, J., in *Morss* v. *Morss* (11 Barb. 510), there is but little to be found in the books on the subject of the competency of a judge to testify in a matter pending before him, it is laid down as a general rule in the elementary books that he is incompetent, and, so far as we have found adjudications, they support the rule.— 1 Whart. Ev. § 400; 1 Greenl. Ev. § 364; *Morss* v. *Morss,* 11 Barb. 510; *Ross* v. *Buhler,* 2 Mart. N. S. (La.) 312; *McMillen* v. *Andrews,* 10 Ohio St. 112.' It is impossible to estimate the weight and influence of the testimony of a witness with a jury, in a cause in which the witness

presides as judge. The written instrument, signed by the testator, was before the jury. Its weight was necessarily more or less weakened by the testimony of the judge.''

Other decisions to the same effect might be cited were it necessary. It seems clear, of course, that what the learned Surrogate could not do, his official representative would be disqualified from doing. No more could Mr. Kieran properly express before a jury his opinion concerning the testamentary capacity of Mr. McCarthy, than could the learned Surrogate have so testified had he conducted the examination of Mr. McCarthy instead of Mr. Kieran.

The primary inquiry in this case is the testamentary capacity of Mr. McCarthy *as of the date of the proposed will, October 31, 1941,* not on November 24, 1941. That examination took place three and one-half weeks after the will offered for probate was executed. If admissible at all, the minutes of the examination on November 24, 1941, and testimony as to what occurred at that time, in view of the other evidence, were of little force and effect. In passing, it may be noted that while a qualified expert might be able to say that a described condition of irrationality or mental aberration on a given date was not of such a recent origin that a similar condition must have existed on a date a few weeks earlier, the testimony of a layman, not a qualified expert, that the speech or conduct of a testator on a given date was irrational, is irrelevant and incompetent as evidence of the mental condition of the testator on a previous day, though only three weeks had elapsed. Irrational speech or conduct might occur under special circumstances any day without indicating, unless the character or quality of the speech or conduct was considered and described by a medical expert introduced as a witness, that the person was irrational on a previous date.

After the examination conducted by Mr. Kieran of Mr. McCarthy at the latter's home, two hearings were held by the Surrogate on the matter of fixing the fee of Mr. Goodstein. The first was on December 3, 1941, and the second was on December 22, 1941. At the latter time the Surrogate stated that he was '' convinced '' that Mr. McCarthy was incapable of '' handling his own affairs.'' That statement is set forth in the minutes of those hearings which were placed in evidence in the record on appeal as Contestant's Exhibit 26.

On a proceeding to determine whether a will should be probated, particularly where testamentary capacity is an issue, minutes of a hearing containing a statement by the Surrogate that he was '' convinced '' that the testator was incapable '' of

handling his own affairs " should not have been admitted in evidence, particularly in view of the fact that the Surrogate never examined Mr. McCarthy and evidently did not meet him. Here we are confronted with the testimony of the Surrogate himself, excluded by the principle hereinbefore discussed. There is some uncertainty as to whether the minutes were actually taken to the jury room by the jury. However, they were admitted in evidence and in the normal course of conduct exhibits are given to the jury to be used as it sees fit in its deliberations. Due to that uncertainty, and because we may not speculate on what consideration the jury may have given to the minutes containing evidence clearly incompetent, the proponent is entitled, because of this error, to a new trial.

The proponent was prejudiced also by allowing the witness Goodstein to testify that the Surrogate had appointed a psychiatrist to examine Mr. McCarthy, which prejudice is emphasized by the suggestion of the Surrogate that the proponent had prevented access to Mr. McCarthy of which there is no testimony. The testimony is that Mr. McCarthy refused to submit to the examination, which was clearly his absolute right and offers no reason for criticism.

The jury reported that on October 31, 1941, Mr. McCarthy was not of sound mind and not competent to dispose of his estate by will. It also found that the will was caused to be executed by undue influence. These findings are inconsistent. A finding of undue influence is distinct from that of testamentary capacity.

In *Matter of Henry* (18 Misc. 149) it was said at page 151: " The issue of undue influence is quite distinct from that of testamentary capacity, yet the two are commonly found united and necessarily considered together; some authorities regard a partial incapacity as a prerequisite to the existence of undue influence. Schouler on Wills (2d ed.), § 226. The condition of the testator's mind will often determine whether a set of circumstances, ambiguous in their nature, amount to undue influence or not; the mental and bodily health of the testator will contribute to the determination of the question of whether or not he acted as a free agent. 27 Am. & Eng. Ency. of Law. 505.

" So the principal question involved in this contest is as to whether or not, at the time of the execution of the will, the testator possessed testamentary capacity."

In *Matter of Tymeson* (114 Misc. 643) Surrogate SLATER said at page 648: " Proof of the evidence of undue influence always presupposes that mental capacity exists. *Matter of Dunn,* 184 App. Div. 386."

In *Matter of Dunn* (184 App. Div. 386, 396) the following appears: " The verdict of the jury, that the will was induced by fraud and duress, must rest in a large measure upon this testimony of Dr. Houghton. Fraud and duress presuppose the existence of a person mentally capable of making a will, and the testimony of Dr. Houghton shows the existence of this mental capacity; but it likewise destroys the entire force of Dr. McKenna's testimony, based upon the theory of aphasia, and there is such a jumble of testimony, and the findings of the jury are so inconsistent with each other, that considerations of justice require that there should be a reversal of the decree." 1 Page on Wills, Lifetime edition, chapter 10, section 185, page 369 contains the following: " Undue influence is said to presuppose mental capacity, and to require it as essential to the existence of undue influence." Thompson on Wills, Second edition, section 145, page 193 contains the following: " It must be borne in mind, however, that a charge of undue influence in obtaining a will concedes the existence of testamentary capacity; and when a person is wholly devoid of capacity to make a will there is no room for the operation of undue influence in the execution of his will."

In this connection it should be noted that in *Matter of Bartholick* (141 N. Y. 166) the only question considered was the right of the Surrogate to refuse probate to an instrument as a will of real and personal property. It did not pass on the question of the effect of answers to incompatible questions.

Under the circumstances, I am of the opinion that the jury should have been carefully instructed as to the distinction between testamentary capacity and undue influence, with the instruction that, if testamentary incapacity was found, the inquiry need not be pursued further.

Prejudicial error was committed by the refusal to charge as requested that there is a presumption of sanity. In *Delafield* v. *Parish* (25 N. Y. 9) the court held that at common law and under our statutes the legal presumption is that every man is compos mentis; that the burden of proof that he is non compos mentis rests on the party who alleges that an unnatural condition of mind existed in the testator; and that he who sets up the fact that the testator was non compos mentis, must prove it.

In *Banker* v. *Banker* (63 N. Y. 409) the court said: " The presumption of sanity always exists — that being the normal condition of man."

The Public Administrator is a creature of statute and his rights are limited by statute. He is authorized to receive process

in any proceeding pending in the Surrogate's Court when service of such process on him for account of or in behalf of any known or unknown person is directed by the Surrogate, and in such proceeding to take any action in behalf of such person available to a party in interest in such proceeding. (Surrogate's Court Act, § 136-z, subd. [19].) There is in this record no direction that process be served on the Public Administrator. His appearance, therefore, would seem to be unauthorized and was properly objected to by the proponent. A special guardian had been appointed to act for unknown infants and incompetents.

Assuming that the deceased lacked understanding at the time of the second marriage, that marriage is not, of course, void. It is voidable upon sufficient proof. (Domestic Relations Law, § 7, subd. 2.) But it is not subject to attack by anyone other than a relative. (Civ. Prac. Act, § 1137.) As has been pointed out, no relative of Mr. McCarthy has been found despite diligent inquiry. The marriage, however, may not be avoided by the Public Administrator, whether or not he was entitled to appear in this proceeding. I am at a loss, therefore, to understand the purpose of a contest of a will leaving to the proponent just what under the circumstances she is entitled to by statute.

The verdict of the jury on the two questions submitted, in addition to being contradictory, is contrary to the weight of the credible evidence. The facts as particularized in this opinion demonstrate that justice requires a new trial. The contentions of the appellant may not be disposed of by generalities.

For the reasons stated, the verdict of the jury should be set aside, the decree appealed from reversed and a new trial ordered.

In the first above-entitled proceeding: UNTERMYER, COHN and CALLAHAN, JJ., concur with DORE, J.; MARTIN, P. J., dissents and votes to reverse and grant a new trial in opinion.

Decree affirmed, with costs.

In the second above-entitled proceeding: MARTIN, P. J., UNTERMYER, COHN and CALLAHAN, JJ., concur.

Order unanimously affirmed, with $20 costs and disbursements. [See *post,* p. 836.]