In the Matter of Proving the Alleged Last Will and Testament of WILLIAM MARSHALL, Deceased, as a Will of Real and Personal Property.

GEORGE B. MARSHALL, Contestant, Appellant; JOHN A. BULLINGER, Proponent, Respondent.

First Department, November 21, 1919.

Surrogate — judicial discretion to allow or refuse costs and disbursements upon probate of will presented by executor who was a party to its fraudulent execution.

The question of allowing or refusing costs and disbursements upon the probate of a will rests within the judicial discretion of the surrogate under section 2746 of the Code of Civil Procedure and ordinarily where

the proponent of the will is the executor named therein, the result of a proceeding for probate is not determinative of the right of the executor to costs, it being his duty to bring forward the will and to assume the burden of its probate.

But where it is shown that the executor was a party ·to the fraudulent execution of a will under which his wife was the residuary legatee, and that, with full knowledge of the fraud, he attempted to impose said will upon the court, it is contrary to good morals and public policy that the estate should be mulcted in the costs and expenses of his unsuccessful effort to perpetuate the fraud.

Appeal by the contestant, George B. Marshall, from so much of a decree of the Surrogate's Court of the county of New York, entered in the office of said Surrogate's Court on the 26th day of March, 1918, as allows the costs and disbursements herein to the unsuccessful proponent and further allows him a counsel fee of $2,500 payable out of the estate.

*Bruce R. Duncan* of counsel [*Clarence B. Campbell,* attorney], for the appellant.

*William S. Butler* of counsel [*Louis B. · Brodsky,* attorney], for the respondent.

Page, J.:

Dr. John A. Bullinger propounded for probate an alleged last will and testament of William Marshall. Objections to the probate of the will were made by the widow who demanded a trial by jury, and an order was duly made directing such a trial of the following issues of fact:

" I. Did William Marshall, the testator, subscribe the paper offered for probate at the end thereof in the presence of each of the attesting witnesses or acknowledge to each of them that such subscription appearing on said paper had been made by him?

" II. At the time of making such subscription or acknowledgment did the said William Marshall declare to each of the attesting witnesses that the paper offered for probate was his last will and testament?

" III. Were there at least two attesting witnesses each of whom signed his or her name at the end of said paper at the request of said William Marshall?

" IV. At the time of the execution of the paper offered for probate was the said William Marshall of sound and disposing mind and memory?

" V. Was said paper executed by the said William Marshall freely and voluntarily as his last will and testament?

" VI. Was the execution of the said paper by the said William Marshall caused or procured by fraud or undue influence?"

The evidence in the case developed the following facts:

Dr. Bullinger and Mr. Marshall had been acquainted with each other for a number of years and were on terms of intimacy. Marshall became very ill. Dr. Bullinger attended him in his professional capacity. A consultation was called and Dr. Thompson was called in and he advised Marshall that he was a very sick man and should put his affairs in order. Thereafter Marshall asked Bullinger to notify a Mr. Morrison, who had been his lawyer for a number of years past and was a distant relative, and a Mr. Graham, who was associated with him in business, to come to his house at three o'clock on Saturday afternoon. Bullinger testified that he notified Morrison and Graham of the appointment and that Graham came but that Morrison did not keep the appointment, and that after waiting more than an hour Marshall said that he did not care thereafter to be disturbed. Morrison denies that Bullinger ever made such an appointment with him. Some ten days later Mrs. Bullinger prepared a will in her own handwriting. Dr. Bullinger had arranged with three persons, friends of his, who were also acquaintances of Marshall, to come to the house whenever he should summon them, for the purpose of executing a will, and at ten o'clock at night he got these three persons together at his office and he and his wife went around to the residence of Marshall with the three witnesses. Morrison had been in the house for two hours that evening and nothing was said to him about the executing of a will. Dr. and Mrs. Bullinger went into the sick room, and Bullinger claims that his wife read the will to Marshall and Marshall said, " yes, that is correct." Thereupon the three witnesses were summoned and all three testify that Marshall was propped up in bed with his eyes closed; two of them testify that Marshall opened his eyes, when Susskind, one of the witnesses to the will, asked him if he knew him, and that Marshall nodded his head and said, " ehm." Susskind, however, testified that he shook Marshall by the shoulders; that Marshall opened his eyes but gave no sign

of recognition and neither nodded his head nor spoke, but merely groaned. Bullinger then informed him that his friends were there for the purpose of witnessing his will. Marshall's name was signed to the will in this manner: Bullinger placed a pen within his hand and took hold of it in such a manner that Bullinger's hand clasped the fingers of Marshall's hand, thereby holding the pen within his grasp; that he then made a cross-mark; when he released his hand the pen fell from the hand; that Bullinger picked it up, placing it within Marshall's hand, and in the same manner made another cross-mark The three witnesses then subscribed the will and went away. Marshall died the next morning at eleven o'clock.

The jury specifically found that the execution of the paper was caused or procured by fraud.

There is no doubt from the testimony that Marshall at the time this will was executed was in a moribund condition and had no knowledge of what was going on. It is not claimed that he gave directions to any one as to the disposition of his property, but by the will, after making some specific bequests, all the rest, residue and remainder of his estate, both real and personal, was given to Mrs. Bullinger, and Bullinger was made the executor thereof. The electric business of Marshall was given to Graham, his business associate, and $5,000 was given to Morrison.

It seems that some two months before Marshall's death Morrison had given to Mrs. Bullinger a blank form of will, and it was because of her possession of this blank form that she was enabled to prepare the will. The evidence of fraud in the execution of this will is overwhelming, and also that Bullinger was an active participant in the fraud and had full knowledge thereof when he propounded this will for probate.

Notwithstanding the fact that the jury found that the propounded will was not the will of Marshall, the surrogate allowed Bullinger $447.80 as his costs and disbursements and a further sum of $2,500 as his allowance for counsel fees, both payable out of the estate. Bullinger's attorney claims that the question of allowing or refusing costs and disbursements rested within the discretion of the surrogate (citing section 2746 of the Code of Civil Procedure), and that where the surrogate has exercised his discretion, an appellate court

will not interfere merely because that court would have acted otherwise. Undoubtedly his position is sound, but the discretion vested in the surrogate is a judicial discretion, and ordinarily, where the proponent of a will is the executor named therein, the result of the proceeding for probate would not be determinative of the right of the executor to costs, it being his duty to bring forward the will and to assume the burden of its probate. But where it is shown, as it was in this case, that the executor was a party to the fraudulent execution of the will and with full knowledge of the fraud he attempted to impose a false and fraudulent will upon the court, it is contrary to good morals and public policy that the estate should be mulcted in the costs and expenses of his unsuccessful effort to perpetuate the fraud.

The decree in so far as appealed from is reversed, with costs to the appellant payable by John A. Bullinger personally.

CLARKE, P. J., LAUGHLIN, SMITH and PHILBIN, JJ., concurred.

Decree so far as appealed from reversed, with costs to appellant payable by the respondent personally.