OPINION OF THE COURT
Bertram R. Gelfand, J.
In this probate proceeding, decedent’s will was previously admitted to probate by decree entered on April 15, 1983 (see Matter of Arnold, NYLJ, March 23, 1983, p 12, col 1). There remains for determination a number of issues arising from the principles enunciated in Matter of Putnam (257 NY 140). These were dealt with on an interim basis by the decree admitting the instrument to probate prohibiting any distribution of the legacies which were then subjudice with respect to Matter of Putnam (supra). A hearing with respect to those issues has now been completed.
Decedent’s will was executed on November 18,1976. She died on June 26,1979, at the age of 81 years. At the time of her death, decedent was a resident of a facility named Fort Schuyler House, where she resided since 1974. In addition to a large number of general bequests to individuals and *266 charitable organizations, the will contains a bequest in the sum of $2,000 to the wife of the attorney-draftsman of the instrument, a bequest of $3,500 to the Reverend Howard M. Weaving, executive director of the above facility at the time decedent resided therein, and a general legacy of $2,500 plus the entire residuary estate to the Reverend John E. Hesford, who was assistant executive director of decedent’s residence until 1977. The attorney-draftsman of the instrument is the named executor.
Decedent had never married and had no issue. Her distributees are eight cousins, all of whom reside in England. No objections to the admission of the propounded instrument to probate were interposed by any of decedent’s distributees.
The legacy to the attorney-draftsman’s wife presents a simple fact question within the well-established perimeters of the Putnam rule (supra). The proof on this subject established that the attorney-draftsman was admitted to practice in 1932. He first met decedent in 1967. Initially, their relationship was social. It gradually became professional with the attorney-draftsman regularly handling such matters as preparing decedent’s income tax returns. In 1972, the draftsman prepared an earlier will for decedent. A copy of this will is in evidence, although the original was destroyed upon the execution of decedent’s present will. The 1972 instrument contains a series of general legacies to cousins of decedent, other persons and a long list of charities. The residuary estate is left to St. Barnabas Hospital. This hospital is reduced to a $2,500 legacy in the instant will.
In November, 1976, decedent requested that the draftsman prepare a new will for her. It was stated that she advised him in detail as to the different legacies that she wished to include and the respective amounts to be bequeathed to each of them. After the attorney’s submission of a draft of the instrument to decedent, she contacted him with regard to a number of changes that she desired. After all of decedent’s proposed alterations were incorporated in the instrument, decedent executed the will. At all times she clearly had testamentary capacity.
*267 In the course of decedent’s professional relationship with the attorney-draftsman, she became acquainted with the draftsman’s wife who assisted her husband at his office. When decedent visited the attorney’s office, she would go to lunch with his wife. In addition, the draftsman and his wife occasionally visited decedent at her home. The court is satisfied that the bequest to the draftsman’s wife was a product of the friendly social relationship between herself and decedent which had endured for a number of years. The instrument itself is supportive of this conclusion in that the relatively minimal legacy to the spouse is only one of a number of bequests to decedent’s various friends.
The legacies to Reverends Hesford and Weaving present more complex issues. They involve a question of law of first impression. Undoubtedly, the concept of judicial scrutiny, in even uncontested matters, of legacies for the benefit of one in a confidential relationship to a testator has been expanded to include clergymen (see Marx v McGlynn, 88 NY 357; Matter of Eckert, 93 Misc 2d 677, affd 70 AD2d 801; Matter of Johnson, 28 Misc 363; Matter of Waters, NYLJ, Nov. 30, 1977, p 13, col 3), as well as to physicians (see Matter of Satterlee, 281 App Div 251; Matter of Marshall, 189 App Div 477; Matter of Small, 105 App Div 140; see, also, Matter of Reiner, 86 Misc 2d 511; Matter of Ehminne, 30 Misc 21), and even to nurses (see Matter of McCarthy, 269 App Div 145, affd 296 NY 987; Matter of Ehminne, supra; Matter of Rudge, NYLJ, May 13, 1983, p 16, col 6; see, also, 2B Warren’s Heaton, Surrogates’ Courts, § 186-D, par 5 [e]). However, to be applicable here it must be even further expanded. In the instant matter, neither of the two legatees, who were ordained ministers of two different denominations, was decedent’s cleric.
While on the face of decedent’s will both legatees are identified as clergymen, the proof adduced at the hearing established that neither of them had a cleric-parishioner relationship with decedent. Their relationship with the decedent flowed entirely from their secular supervisory responsibilities in the facility in which decedent lived. It is not even clear that decedent was of the same religious persuasion as either Reverend Hesford or Reverend Weaving.
*268 The threshold question presented is whether the judicial scrutiny flowing from Matter of Putnam (257 NY 140, supra), extends to legacies for the benefit of those who control a facility for the aged.
The testimony adduced with reference to the nature of Fort Schuyler House is germane to whether an inquiry flowing from the provisions of Matter of Putnam (supra), is both appropriate and necessary. The evidence on this subject established that Fort Schuyler House was a limited income publicly subsidized multiple dwelling governed by a board of directors which was a direct outgrowth of sponsorship by the governing board of a religious sect. The facility was specifically designed to provide housing for the aged under circumstances in which they lived in private units, but shared central areas for recreation and sustenance. The facility’s staff had the duty of overseeing their needs. The board of directors was essentially limited to making policy and hiring an executive director.
Admission to the facility was based upon an application which included a complete financial statement. The administration of the facility, and the services received by the respective residents, were under the daily supervision and control of the executive director. His responsibilities also encompassed reviewing annual financial statements that each resident had to file to facilitate the director annually determining if the resident remained eligible to continue living in the facility under the guidelines fixed by law.
The development of the law in a particular area is a direct response to a societal need for regulation. Clearly, before we had nuclear energy our laws were devoid of both reference or sensitivity to any need for nuclear regulation. Similarly, before the proliferation of the motor vehicle, our laws were devoid of the countless references to motor vehicle operations that permeate both our civil and criminal law. Increased health care and rapidly expanding longevity have made the increase in the aged population as dramatic an occurrence as both the invention of the motor car and the effort to harness nuclear power. A concomitant of longer life has been a dramatic expansion in the need for facilities specifically geared to meet the varying needs of *269 an aged population that runs the gamut from the completely self-sufficient to the bedridden, and encompasses all the gradations of physical and/or mental infirmity between the vigorous and the totally infirm.
Like all new phenomena, availability is slow in catching up to need. That the demand for admission to facilities for the aged substantially exceeds availability is a fact that is sufficiently known to exist in the New York metropolitan area to an extent which justifies the court’s taking judicial notice of this fact. In the instant matter, the testimony established that applications for admission to the facility exceeded the number of units. Clearly, to be admitted and remain as a resident was a prized achievement. In the instant matter, the testatrix during the time that is germane to the preparation and execution of her will was essentially homebound due to the infirmities of age.
Matter of Putnam (supra), in a matter involving a bequest for the benefit of a decedent’s attorney, developed the concept of judicial scrutiny of legacies for those in a confidential relationship with a decedent. As the thesis was extended in the hereinabove-cited cases to physicians, nurses and clerics, a basic concept is discerned that indicates the scope to which the court should go in uncontested matters in compelling a legatee to go forward and establish that his particular legacy was the product of neither undue influence nor overreaching. The controlling principle appears to be not only whether the legatee’s relationship with the testator was confidential, but was it one in which the dependence of the testator on the legatee was such that it presents more than a remote possibility of lending itself to intruding on the testator’s freedom of action.
In American society, as it exists in the final 20 years of this century, it must be concluded that those who oversee the day-to-day needs of the aged in facilities for their care, and whom the aged perceive to control their continued peaceful enjoyment of the care and comfort they receive, are in both a confidential and controlling relationship to such aged individuals that is totally comparable to the attorney-client, patient-physician, patient-nurse, or cleric-parishioner relationships. It is a relationship that is every bit as fraught with the dangers of imposition and over *270 reaching as any of the other “confidential” relations to which the Putnam concept has been expanded. Clearly, a legacy for the benefit of one having such a profound control over the destiny of an aged person requires judicial satisfaction that it is voluntary before it is effectuated (see Matter of Brandon, 55 NY2d 206).
The proof unequivocably establishes that at all times pertinent to the preparation and execution of decedent’s will, Reverends Weaving'and Hesford directly managed and controlled the facility in which decedent resided and that her life was virtually confined to the perimeters of this facility. The relationship of the testatrix to the Reverend Hesford was relatively tangential. From 1975 through 1976, Reverend Hesford’s responsibilities as assistant director of Fort Schuyler House were part time. He devoted one day a week to his duties. In his capacity as assistant director, he met decedent when she was considering applying for admission to the facility. After her admission, he visited with her periodically. These visits were relatively perfunctory and were not any different from his routine relationship with the other residents. They rarely exceeded a maximum of 20 minutes. Reverend Hesford claimed that he never learned decedent’s religious persuasion, nor did he ever discuss religious matters with her. In 1977, he ended his association with Fort Schuyler House and turned to another administrative position. He could recall no further contact with decedent, and denied any knowledge of his inclusion in decedent’s will until after decedent’s death. No relationship is indicated between the beneficiary and the draftsman during decedent’s life. The uncontroverted proof indicates that the draftsman was decedent’s attorney prior to her residing at Fort Schuyler House. He was retained by the testatrix without any involvement of any beneficiary. It is also noted that in this matter, in which the Public Administrator and the Attorney-General have conducted extensive pretrial discovery, there is no evidence controverting the Reverend Hesford’s testimony that he has not been the beneficiary of a bequest from any other resident of the facility other than this testatrix.
Undoubtably, the tangential relationship of the Reverend Hesford with the testatrix renders his good fortune in being the primary object of her significant bounty a *271 particularly fortuitous occurrence for him. However, it is not for the court to speculate on what might incline a competent testatrix to view a particular individual with exceptional kindness. Giving great weight to the instrument having been drawn by counsel independent of the residuary legatee, or anyone associated with him, it is concluded that the totality of the proof permits the legacies for the benefit of the Reverend Hesford to meet the test of being a voluntary act of a competent testatrix acting free of undue influence or overreaching.
The relationship of the testatrix with the Reverend Weaving presents a more complex set of facts. During his tenure as executive director of the facility, he personally became a beneficiary under the wills of several of its residents and also benefited from their deaths by property passing to him by operation of law (see Matter of Smith, NYLJ, Jan. 21, 1982, p 11, col 4; Matter of Norton, NYLJ, Oct. 24, 1980, p 14, col 1; Matter of Yeager, 824-P/1981; Matter of Leighton, 823-P/1981). The issues in the Norton estate were settled. Objections to probate are pending in the Smith, Yeager and Leighton estates. In taking judicial notice of its own files, the court notes that the instant case is the only matter in which there is not a common draftsman of all of the instruments.
Reverend Weaving first met decedent in 1973, when she applied to be admitted to Fort Schuyler House. Decedent was then retired from a career as a secretary and felt the need to move from a deteriorating neighborhood into a facility more consistent with the needs of her advancing age. When decedent first moved into the facility, her contact with Reverend Weaving was limited to brief conversations in passing as she went to and from meals. However, in 1976, decedent’s physical condition began to deteriorate. She had the occasion to call upon the executive director for her needs on an increasingly frequent basis. Decedent would request that he come to her apartment in order to ask him to obtain a doctor or nurse, or to arrange for meals to be taken up to her apartment. It was claimed by the executive director that the time he usually spent with the decedent in performing these tasks was relatively brief. Aside from these relatively brief visits, the beneficiary *272 never spent any sustained period of time with her alone. He never developed a social relationship of any kind. Reverend Weaving testified that he had no knowledge whatsoever of the preparation and execution of decedent’s will, nor did she ever intimate to him that he was named as a beneficiary of her estate.
The uncontroverted evidence further indicates that no relationship of any kind existed between the beneficiary and the attorney-draftsman and that the beneficiary played no role whatsoever in the drafting or execution of decedent’s will. He also stated that he did not learn of the bequest to him until he was contacted by the attorney-draftsman after decedent’s death. The Reverend initially could recall no other legacies to him from residents. After his recollection was refreshed, he did remember several other bequests from residents of the facility.
The court is sensitive to the suspicion which may flow from so many other residents of the facility which the legatee managed viewing him as an object of their bounty.. Nevertheless, the court must carefully adhere to the distinction between what reasonably flows from proof and adventures into impermissible speculation. A most careful consideration of the totality of the record in the instant case leads to a conclusion that the legacy for the benefit of the Reverend Weaving must be accepted as being a product of decedent’s voluntary desires. In reaching this conclusion, the court places great weight on the fact that there is not a scintilla of evidence to suggest either direct or indirect participation by the beneficiary in the drafting or execution of the instrument, his lack of relationship with the draftsman, and the uncontroverted testimony that the legatee did not learn of the legacy to him until after the testatrix’ death.
Parenthetically, it is noted that the testimony indicates that the fruits of the instant controversy have been the enactment by the directors of this facility of regulations more consistent with the confidential nature of the relationship which exists between those controlling a facility for the aged and those who reside therein. The present executive director of Fort Schuyler House testified that under the current guidelines governing the conduct of all *273 of the staff of the facility, involvement by employees or officials in the financial affairs of the residents is clearly circumscribed.