*147 OPINION OF THE COURT
Dan Lamont, S.
In this probate proceeding, the propounded instrument contains a $5,000 bequest to the attorney-draftsman. This court on its own motion conducted a hearing pursuant to Matter of Putnam (257 NY 140 [1931]).
The propounded instrument is dated March 20, 1984. The decedent died April 25, 1984, at the age of 77 years. Decedent’s husband predeceased her. She never had any children. Her distributees were a niece in Flushing, New York, and several other nieces and nephews in Germany — whose names and/or whereabouts are unknown. The decedent’s entire gross estate consists of about $60,000.
The propounded instrument gives $5,000 each to six friends and neighbors of decedent; $2,000 to another friend; $5,000 to the attorney-draftsman; and the residuary to the Grand Lodge, Free and Accepted Masons. Another friend and neighbor is named as executor.
At the Putnam hearing, Frank Wilson (witness to will), Stewart Mace (witness to will and named executor), Clyda Mace ($5,000 beneficiary), and Cheryl Sokaris ($5,000 beneficiary) testified for the attorney-draftsman, who also gave testimony in his own behalf. The testimony of each witness, including the attorney-draftsman, is found generally credible —but, colored by his interest. Copies of three prior wills made by decedent on January 6, 1984; January 13, 1984; and February 10, 1984, were received in evidence — along with a copy of the propounded instrument dated March 20, 1984.
FINDINGS OF FACT
In December 1983, Elsa Tank was in failing health, and told Frank Wilson that she wanted to make a will. Frank Wilson brought the attorney-draftsman to Elsa Tank’s home in late December 1983. Her home was located in the remote countryside, some 15 or 20 miles from the nearest village. The attorney-draftsman had never before met the decedent and was a total stranger.
Mrs. Tank discussed her will with the attorney-draftsman and told him the names of several friends and neighbors to whom she wished to bequeath $2,000, $3,000, $5,000 or $10,-000. She was very grateful that the attorney-draftsman had come to her home, and she said she wanted him to have $5,000 in her will. When he declined, decedent held his hand *148 and refused to proceed any further until he wrote down his own name upon the yellow pad upon which he was taking notes for preparation of the will.
The will was prepared and typed at the attorney-draftsman’s office and was thereafter executed by decedent at her home on January 6, 1984. The will was read aloud to decedent before she signed it. She indicated that her friends and neighbors — several of whom she had invited to the signing ceremony — were the objects of her bounty.
Thereafter, the decedent made three more wills. On each occasion, she telephoned the attorney-draftsman at his office and advised him of certain changes to be made in the specific bequests to neighbors and friends. Each will was prepared by the attorney-draftsman at his office and was then executed by decedent at her home under the supervision of the attorney-draftsman. On each occasion, the will was read aloud to the decedent before she signed. After each execution ceremony, at the direction of the decedent, the attorney-draftsman destroyed each of the prior wills upon returning to his office.
The four wills are essentially similar and all four wills contain a $5,000 bequest to the attorney-draftsman. The attorney-draftsman was paid a $25 fee for the preparation and execution of each will. The decedent was mentally competent to make a will and execution of the propounded instrument was proper in all respects.
CONCLUSIONS OF LAW
The law, recognizing the delicacy of the situation, requires the lawyer who drafts himself a bequest to explain the circumstances and to show in the first instance that the will was freely and voluntarily made (Matter of Putnam, 257 NY 140, 143 [1931], supra; see, Roth, The "Putnam” Doctrine, NYLJ, June 19, 1978, p 1, col 1).
Generally, the explanation consists of proof that the beneficiary was a natural object of the decedent’s bounty — such as a relative or a close friend. In this case, the attorney-draftsman was a total stranger.
In Matter of Weinstock, Judge Jones stated that "[Although] the provisions of the Code of Professional Responsibility are not to be elevated to the status of decisional or statutory law, nonetheless the courts should not denigrate them by indifference”. (Matter of Weinstock, 40 NY2d 1, 6, citing cf. People v *149 Hobson, 39 NY2d 479, 484-485; Matter of Rosenthal v Harwood, 35 NY2d 469.)
The Code of Professional Responsibility contains a precisely pertinent provision: "EC 5-5. A lawyer should not suggest to his client that a gift be made to himself or for his benefit. If a lawyer accepts a gift from his client, he is peculiarly susceptible to the charge that he unduly influenced or overreached the client. If a client voluntarily offers to make a gift to his lawyer, the lawyer may accept the gift, but before doing so, he should urge that his client secure disinterested advice from an independent, competent person who is cognizant of all the circumstances. Other than in exceptional circumstances, a lawyer should insist that an instrument in which his client desires to name him beneficially be prepared by another lawyer selected by the client.”
In this instance, the attorney-draftsman did not urge that his client secure disinterested advice from an independent, competent person, nor did he insist that the instrument (will) in which his client desired to name him beneficially be prepared by another lawyer selected by the client. The attorney-draftsman is certainly peculiarly susceptible to the charge that he overreached the client.
Courts of equity will scrutinize with jealous vigilance transactions between parties occupying fiduciary relations toward each other. (Code of Professional Responsibility, EC 5-5, n 1; McFail v Braden, 19 Ill 2d 108, 117-118, 166 NE2d 46, 52 [1960].) The fiduciary, "confidential relationship” of attorney-client is fraught with the dangers of imposition and overreaching. The overreaching can arise purely and simply from the position of responsibility entrusted to attorneys generally.
The judicial writings applying the Putnam doctrine generally explore the relationship, friendship, and/or affection between the decedent and the attorney-draftsman which serves as the conventional basis or explanation of the gift. If the attorney is a relative or friend of the decedent with a longstanding relationship of friendship, the objective, rational basis of the gift is explained and the bequest allowed to stand. (See, e.g., Matter of Arnold, 125 Misc 2d 265 [Sur Ct, Bronx County 1983] [$2,000 bequest to wife of attorney-draftsman upheld as product of friendly social relationship which had endured for a number of years]; Matter of Annesley, 97 Misc 2d 1047 [Sur Ct, NY County 1979] [bequest of small fraction of estate to nephew who maintained close social relationship *150 with aunt, having dinner at least twice a week with her, upheld].)
Here, the attorney-draftsman saw the decedent on only five occasions — and the very first time he met her, she "insisted” that she would leave him $5,000 in the very will that he was summoned to prepare. I credit the attorney-draftsman’s testimony that this physically ill and incapacitated decedent was grateful that he came to her home to prepare her will and that she did "insist” that he would be one of her beneficiaries. On the other hand, the bequest could be at least partially the product of subtle ingratiating or over-solicitous conduct on the part of the attorney.
Essentially, this attorney-draftsman received the gift purely because he is a lawyer duly admitted to practice, and was summoned to perform professional services for an infirm, elderly lady, wishing to exercise her legal right to dispose of her own property upon her death. The issue thus presented is whether the Surrogate’s Court should let stand such a $5,000 bequest to an attorney-draftsman who had just met the decedent? Stated another way, should an attorney entrusted to perform the professional responsibility of assisting his client in disposing of her own property upon her death be allowed to accept a bequest to himself which has absolutely no basis in relationship, affection, or friendship, but is purely the product of being in the right place at the right time?
By neither objecting nor consenting to the bequest, the residuary charitable beneficiary and the Attorney-General have put this court in a difficult position. That difficulty is further enhanced and compounded because the attorney-draftsman beneficiary represents the proponent executor, and therefore has a conflict of interest with the residuary beneficiary. The New York State Bar Association, Committee on Professional Ethics, has indicated that a lawyer-beneficiary under a will faced with a conflict should either resign as attorney for the estate or decline the bequest. (New York State Bar Assn Comm on Professional Ethics, opn No. 356.)
The bequest to the attorney-draftsman has no normal or natural explanation, and raises the spectre of overreaching. The bequest certainly cannot be described as the natural product of the gratitude of an elderly woman nearing the end of her years and the attorney who drafts her will, but who is otherwise a total stranger.
Under the circumstances of this case, this court concludes *151 that the acceptance of a $5,000 gift by drafting a will containing such a bequest from an elderly client whom the lawyer had just met for the very purpose of preparing her will constitutes professional overreaching which the Surrogate’s Court cannot and should not countenance. The ethics and dignity of the legal profession require that such a bequest without any rational foundation or explanation to an attorney-draftsman who is a total stranger be disallowed by the courts. (Cf. Matter of Weinstock, 40 NY2d 1, supra.) The lawyer had an ethical duty to further discourage and refuse such a bequest — particularly when not founded upon any friendship, relationship, or affection. The very purpose of the Putnam doctrine is to prevent the inherent wrong of an elderly decedent unduly or inexplicably rewarding those upon whom she becomes dependent such as doctors, nurses, clergymen, lawyers, etc. — absent a natural, acceptable explanation and independent basis for the gift. That the attorney-draftsman prepared four wills for the 77-year-old decedent during the last four months of her life does not change the result.
This court is not suggesting that someone offered a $5,000 bequest has an easy time saying no; however, the high ethics of an honorable profession require that a gift for which there is no natural or rational foundation simply must be declined by an attorney-draftsman. Acceptance of such a bequest involves impropriety and overreaching by the attorney, and a concomitant breach of professional responsibility to the testatrix. (See, Matter of Weinstock, supra.) Only firmness of the law in rectifying the situation can maintain the deserved public confidence in the faithfulness and professionalism of lawyers generally.
Only the disposition to the attorney-draftsman must be denied effect. (See, Matter of Lawson, 75 AD2d 20 [4th Dept 1980]; Matter of Eckert, 93 Misc 2d 677 [Sur Ct, NY County 1978].) Accordingly, the decedent’s last will and testament is admitted to probate, except for the provision in paragraph "third: C” which contains the specific bequest to the attorney-draftsman.